In re CLINTON STREET POLICE STATION SITE IN CITY OF NEW YORK.

(Supreme Court, Special Term, New York County. May 24, 1910.)

1. EMINENT DOMAIN (§§ 317, 324*)—ACQUISITION OF REAL ESTATE—RIGHTS ACQUIRED—FEE.

Where a city acquired, as authorized by Laws 1899, c. 652, a tract of land as a fire protecting space for a bridge erected as authorized by Laws 1895, c. 789, as amended by Laws 1896, c. 612, and for the purpose of giving passage to and from a street, and then constructed a roadway over the same for the use of the public, the space could not be built on or changed, and land abutting thereon abutted in effect on a street, for though the city acquired the fee, it was a qualified fee only.

[Ed. Note.—For other cases, see Eminent Domain, Dec. Dig. §§ 317, 324.*]

2. EMINENT DOMAIN (§ 131*)—COMPENSATION—ELEMENTS.

Where land abutting on an open space acquired by a city for a public purpose and used by the public as a street is sought to be taken for a public purpose, the owner is entitled to compensation, on the theory that the land possesses the elements of a corner with the easements of light, air, and access.

[Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. § 353; Dec. Dig. § 131.*]

3. EMINENT DOMAIN (§ 202*)—COMPENSATION—EVIDENCE.

In proceedings to acquire land for a public purpose, all the facts as to the condition of the land and its surroundings, improvements, and capabilities may be shown in estimating the value thereof.

[Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. § 541; Dec. Dig. § 202.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

4. EVIDENCE (§ 558*)—EXPERTS—EXAMINATION.

In proceedings to acquire land for a public use, hypothetical questions put on the cross-examination of an expert on value as to the construction of buildings on the parcel in controversy and on an adjoining parcel to test the witness' knowledge and competency are proper.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2377, 2379; Dec. Dig. § 558.*]

5. EMINENT DOMAIN (§ 238*)—COMPENSATION—EVIDENCE.

The error of the commissioners of assessment and appraisal in proceedings to · acquire land for a public use in receiving proof of an improper item of damages is harmless where they rejected the claim therefor.

[Ed. Note.—For other cases, see Eminent Domain, Dec. Dig. § 238.*]

6. EMINENT DOMAIN (§ 138*)—COMPENSATION—DAMAGES TO ADJACENT PROPERTY.

Where, in proceedings to acquire a tract of land for a public use, the owner showed his intention to improve the tract by erecting thereon a tenement house limited to the area of the parcel, with store fronts on a street and on an open space, acquired by the city and in effect used by the public as a street, the owner was not entitled to consequential damages for the part of his land remaining.

[Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. § 370; Dec. Dig. § 138.*]

7. EMINENT DOMAIN (§ 131*)—MEASURE OF COMPENSATION—ELEMENTS.

Where land abutting on an open space acquired by a city was sought to be taken by the city, the fact that the owner, though having no right of access on the open space, could erect a building bordering thereon with windows overlooking the open space, was an element of damage which must be taken into consideration in estimating the damages.

[Ed. Note.—For other cases, see Eminent Domain, Dec. Dig. § 131.*]

8. EMINENT DOMAIN (§ 131*)—COMPENSATION—MARKET VALUE.

The measure of compensation for taking of land by a city for a public use is the market value at the date of the vesting of the title in the city, and the market value includes the value of the property for any use to which it may be put.

[Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. § 353; Dec. Dig. § 131.*]

Proceedings by the City of New York to acquire land for a police station site.   Heard on objections by the city to a report of the commissioners of assessment and appraisal.   Report referred back for correction as ordered.

Archibald R. Watson, Corp. Counsel (Francis J. Byrne, of counsel), for the City of New York.

Strong & Cadwallader (Edward W. Murphy and Francis P. O'Connor, of counsel), for claimants.

GIEGERICH, J.   These proceedings were instituted for the purpose of acquiring lands and premises for a police station.   The premises acquired comprise a tract of land situate on the east side of Clinton street at the immediate entrance of the Williamsburgh Bridge approach on the Manhattan side, and adjoining the southerly clearance line of such bridge; running thence, east, 99 feet 11¼ inches; thence, south, 81 feet 3¼ inches from such clearance line; thence, west, 99 feet 11½ inches; and thence, north, along the easterly side of Clin-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ton street, 81 feet 11½ inches, to the point or place of beginning; the total area equaling 8,154.16 square feet, slightly more than three and one-quarter city lots. When the city acquired title, viz., on October 8, 1907, there were then upon the lands in question two two-story buildings, containing an attic and basement and having a brick front and frame in the rear, and two two-story and attic frame buildings, front and rear, which four buildings were not considered to be of any value by either of the parties to the proceeding. The claimants also own the parcel of land immediately adjoining on the south upon which there is an old brick structure known as Apollo Hall, 2½ stories in height on the outside and 2 stories on the inside, the lower part being rented for a moving picture show and the upper part for a dance hall, such parcel being in width 44 feet and 5 inches in front on Clinton street and 44 feet in the rear, and 99 feet and 3 inches in depth on the northerly side and 100 feet and 4 inches on the southerly side. Immediately adjoining the property on the north and forming a part of the bridge approach is an open paved space of about 29 feet in width, which, as will hereafter appear, had been acquired by the city in a prior proceeding for the protection of the bridge structure from fire, pursuant to the provisions of chapter 652 of the Laws of 1899, hereinafter set forth. The other statutes authorizing the erection of the bridge and its approaches, so far as applicable to the question in controversy, are hereinafter set forth.

Only two of the commissioners of assessment and appraisal have signed the report by which the sum of $141,308 was awarded to the claimants. The reason why the third commissioner did not sign the report is shown by the following extract from the proceedings of the commissioners:

"Commissioners Wiener and Meng state that the amount of the awards to the claimants in this proceeding is the sum of $141,308. They thereupon signed the preliminary report, and the damage map attached to the same."

"Commissioner White states that he is unable to agree with his co-commissioners as to the amount of the award, and that in his opinion the award should not exceed $124,575."

The city claims that the award so made by the two commissioners is excessive, and that the value of the damage parcel in suit is not more than $101,200, which was the valuation placed upon it by one of its experts. The other two of the city's experts, estimated its value to be $99,101 and $99,933, respectively, while the claimants' experts valued it at $217,044.31 and $218,769, respectively. These wide divergences in the estimates of the claimants' experts on the one hand and those who testified for the city on the other are mainly due to differences of opinion as to the nature of the rights, if any, of the claimants to the above-mentioned open paved space so adjoining the damage parcel in suit, and as to the best uses to which the property so facing such space could lawfully be put. It appears from the uncontradicted testimony of Mr. Francis P. Perry, the assistant engineer in charge of the construction of the Manhattan approach of the Williamsburgh Bridge, that the strip of land in question was acquired for a fire clearance line for the bridge a fixed distance south from the East river "all the way up to Clinton street, across to Suffolk street," in

order to prevent damage by fire to the steel structure and adjacent property. Mr. Perry further testified that the space referred to was paved and open to pedestrian traffic, and that pedestrians used it just the same as any street or lane in the city. It was further shown by the testimony of Mr. Perry and by the contract drawings that the strip of land in question was used not only as a part of the bridge approach, but for other street purposes as well. Attorney street, which is the next street to the east of Clinton street, had to be closed at the point where it was intersected by the bridge, and, in order to afford traffic passing northward on Attorney street, an outlet to Clinton street, and an opportunity to continue to the northward generally, this space in question was opened as a roadway for the passage of such traffic, either out of or into the portion of Attorney street referred to, which otherwise would have had a blind end at the point where it headed up against the bridge structure.

The claimants contend that, because their plot fronted upon such marginal fire protecting space, it had an additional advantage over inside lots, and made such plot susceptible of improvement with a structure possessing 100 feet additional store front on the strip in question, in addition to the 81 feet of store front property on Clinton street, and apart from the light available to the upper stories. They therefore insist that these elements should be taken into consideration in estimating the value of the property, and that, since the outside lot had all the elements of a corner, the amount awarded for the property was the fair market value of the same when the city acquired title thereto. The city, on the other hand, maintains that it owns the lands embraced within such open space in fee simple absolute, free of any easement or quasi easement in the claimants, as abutting owners or in the public, and that it can close up such open space at any time the necessities of the department of bridges require, and consequently the most northerly lot of the damage parcel in suit has not the qualities of a corner lot, but must be treated as an ordinary inside lot, and therefore that the award made by a majority of the commissioners for such parcel is excessive. These contentions of the respective parties to this proceeding bring up for discussion, among others, the question whether or not the claimants have any right whatever in such open space, and, if they have, the extent thereof. It will therefore be necessary to examine the various enactments respecting the acquirement of lands for the construction of the bridge and its approaches, and for other purposes, in order to determine whether such open fire protecting space was created by legislative authority, as urged by the claimants.

The earliest legislative authority for the erection of the said bridge is contained in chapter 789 of the Laws of 1895, section 2 of which directs that:

"Upon the appointment of said commissioners they shall proceed as soon as possible to prepare a plan of a permanent suspension bridge to be constructed over the East River between the cities of New York and Brooklyn, from, at or near the foot of Broadway, in said city of Brooklyn, to at or near the foot of Grand street, in said city of New York, which plan shall show the approaches to said bridge, the land necessary to be taken therefor, the height and all other particulars relating to said bridge, including piers

and abutments; and for this purpose said commissioners are authorized to employ competent engineers and to invite submission to them of plans of construction and estimates of the expense thereof, and may hold public hearings in regard to the same if they so determine. After due consideration they shall adopt such plan as to them may seem best adapted to carry out the purposes authorized by this act, and shall file a copy of the same, signed by said commissioners, in the office of the commissioner of public works of the city of New York, and a copy thereof, so signed, in the office of the commissioner of city works of the city of Brooklyn, and shall retain the original thereof so signed as a part of their records."

The act last mentioned was amended by chapter 612 of the Laws of 1896, which, in section 3 thereof, provided:

"Upon the adoption of said plan and the filing thereof, as provided in section 2 of this act, the said commissioners shall proceed to construct said bridge, the approaches and all the appurtenances thereto in accordance therewith, and for that purpose the said commissioners are authorized to enter into contracts, to employ engineers, * * * to purchase, receive, hold and use such real estate or interest therein as may be necessary and convenient to accomplish the object authorized by this act, and they may, by their surveyors, engineers or officers enter upon such real estate, sites and locations, and take possession of the same in the joint name of the city of New York and the city of Brooklyn. The title to all such real estate or interest therein shall be taken to and in the corporate names of the cities of New York and Brooklyn as joint tenants. * * *"

By chapter 652 of the Laws of 1899 there was enacted the following provisions, among others, relative to the original Bridge Act known as chapter 789 of the Laws of 1895, viz.:

"Section 1. The commission created and existing under and in pursuance of the provisions of chapter 789 of the Laws of 1895, and laws subsequently passed, is hereby authorized to prepare, adopt and file an amended plan of the permanent suspension bridge over the East River, authorized to be constructed by said act, so as to include as part of the real property necessary to be acquired for said bridge and for the approaches thereto, such additional lands adjacent to the anchorages and to the towers of said bridge as shall in the judgment of the said commission be necessary for the protection of the said anchorages and towers against the danger of fire or other casualty. After the adoption of such amended plan, a copy thereof, signed by the president and secretary of said commission, shall be filed in the office of the Corporation Counsel of the City of New York, and another copy thereof, so signed, shall be filed in the office of the board of public improvements in said city, and the original thereof, so signed, shall be retained by the said commission as a part of its records. * * *

"Sec. 4. Anything contained in chapter 789 of the Laws of 1895, or in any laws subsequently passed inconsistent with this act, is hereby repealed * * *."

It is apparent from a reading of the foregoing statutory provisions that not only were plans to be prepared by engineers and surveyors for the construction of the bridge and approaches thereto upon lands to be acquired for the purpose, but that amended plans were to be prepared, adopted, and filed so as to include such additional lands adjacent to the anchorages and the towers of the said bridge as should, in the judgment of the commission, be deemed necessary for their protection against fire or other casualty. Page 5702 of the contract plans and drawings filed in the department of bridges of the city of New York shows the lands bordering the claimants' property on the north to be an open space, with a roadway 19 feet and 7 inches wide, and a side-

walk adjoining on the north 10 feet wide, which latter is adjacent to the claimants' property.

Mr. Perry testified in regard to such roadway and sidewalk, as follows:

"Q. What was the approximate width of the passageway in question, the same as shown on this plan? Mr. Bryne: This is all under the same objection. Same ruling. Mr. Byrne: Exception. A. The same as shown on this plan.

"Q. With a 10-foot sidewalk and about 19-foot roadway as shown on this plan? A. No sidewalk.

"Q. No sidewalk? A. It was paved the entire width, but there was no sidewalk. It was simply another modification of the same thing.

"Q. Was it paved? A. Asphalt pavement the entire width.

"Q. You say it was paved the entire 29 feet? A. The entire width as given here (referring to plan).

"Q. And was open for public traffic? (Same objection, same ruling. Exception taken by Mr. Byrne.) A. Open for pedestrian traffic."

The corporation counsel claims that the official plan of the bridge, filed in conformity with the provisions of the act above quoted from, does not in any wise indicate an open passageway for pedestrian use alongside of the bridge structure proper, unless the light dotted line traversing the whole length of the property acquired from Clinton street down to the East river might be regarded as outlining or indicating that it was intended as such an open space for foot passengers; but such plan need not be prepared with the minutest detail required for the awarding of a contract for the erection of the improvement. Matter of City of N. Y., 104 App. Div. 445, 93 N. Y. Supp. 655. The corporation counsel, however, admits that the official plan of the bridge shows an open space for pedestrian use on the southerly side of the bridge running from Clinton street down to Attorney street. This is in the same block and on the side of the bridge approach on which the damage parcel in suit is situated. The contract drawings for the construction of the Manhattan subway station for the Williamsburgh Bridge, under which said open paved space was constructed, show very minutely the roadway and sidewalk above indicated, consisting of a space of about 29 feet 7 inches between the most northerly point of the property acquired in this proceeding and the southerly line of the bridge structure, such space or roadway extending from the bridge approach at Clinton street to Ridge street, which is the farthest street east shown on the page of the contract plans and drawings above mentioned. By such contract drawings all parties in interest, including the city and the claimants, were informed that the lands embraced within such open paved space were to be acquired for a marginal or fire protection space. Matter of City of N. Y., 174 N. Y. 26, 34, 66 N. E. 584. After such roadway has been constructed, the city has no power to alter or change it as long as it is used as a fire protecting space, and for the additional purpose of giving a passage to and from Attorney street. It cannot be utilized for any other purpose; and it is too speculative to consider what might happen in case the entire bridge structure should be discontinued. Consequently such space cannot be closed or built upon, or altered or changed, nor can the lands embraced within it be sold, leased, or otherwise disposed of, as urged

by the corporation counsel, without new legislative authority first had and obtained. Matter of City of N. Y., 74 App. Div. 202, 208, 77 N. Y. Supp. 737; 1 Lewis on Eminent Domain (3d Ed.) §§ 127, 128, 219; 2 Id. § 450. The cases of Brooklyn Park Commissioners v. Armstrong, 45 N. Y. 234, 6 Am. Rep. 70, and Hearst v. Shay, 156 N. Y. 169, 50 N. E. 788, cited by the corporation counsel, instead of being authorities to the contrary, will be found upon a reading thereof to amply sustain the proposition that the property acquired for a public use under legislative enactment cannot be devoted to a different use than the one for which it was acquired except by legislative authority.

The corporation counsel contends that the lands comprised within the fire protecting space or roadway were acquired in fee simple absolute, because the counsel for the claimants entered into the following stipulation upon the record, viz.:

"Mr. Bryne: The city's case is closed, and the case may now go to the commissioners upon briefs, provided only that it be stipulated of record that the city owns in fee all of the lands comprised within the bridge approach and lying northerly of the northerly line of the premises here taken in this proceeding, and northerly of the line marked 'southerly clearance line of the Williamsburgh Bridge.' Mr. O'Connor: It is so stipulated."

The term "in fee," as applied in the foregoing stipulation, must be construed in the light of the purposes for which the land embraced within such fire protecting space was to be devoted, viz., "for the protection of the said anchorages and towers against the danger of fire or other casualty," and therefore the taking by the city of such land in fee simple absolute was neither contemplated nor warranted by the language of the several provisions above quoted. Matter of City of N. Y., 74 App. Div. 197, 207, 208, 77 N. Y. Supp. 737, affirmed 174 N. Y. 26, 34, 66 N. E. 584; 1 Lewis on Eminent Domain (3d Ed.) §§ 127, 128; 2 Id. § 450. The same reasoning applies with equal force to the further point made by the corporation counsel that because the petition in the proceeding to acquire the lands immediately adjoining on the north of the damage parcel in suit recites that such lands were sought to be acquired in fee simple, and because it was determined in such proceeding that the city did take such a title thereto, it actually acquired title in fee simple absolute, notwithstanding the purpose for which such space or roadway was to be used. This contention is contrary to the principle laid down in Matter of City of New York, supra, where, although the law provided that the title to lands condemned for the widening of streets designed to make a certain bridge with its structural approaches more accessible should vest in the city in fee simple, it was nevertheless held to mean a qualified fee and that the city could not dispose of the land for other purposes.

It thus appearing that the land intended primarily as a fire zone cannot be devoted to any other purpose, the question next arises whether it became a part of the approaches to the bridge. As bearing upon this question, it should be noted that chapter 652 of the Laws of 1899 (above quoted) confers upon the commission authority to adopt an amended plan and "to include as part of the real property necessary to be acquired for said bridge and for the approaches thereto such additional lands adjacent to the anchorages and to the towers of said

bridge as shall in the judgment of the said commission be necessary for the protection of the said anchorages and towers against the danger of fire or other casualty." In my opinion this language can fairly be construed as authorizing the commission to embrace such additional lands acquired primarily for protective purposes in the area used in fact for approaches, and that, when it has been so embraced, it becomes as much a part of the approaches, and consequently as much a public street as though it had been originally acquired for the sole purpose of an approach.

This conclusion disposes of the contention of the corporation counsel that the claimants cannot escape the effect of the final adjudication in the proceedings by which, it is asserted, the city acquired in fee simple absolute the lands forming such space or roadway north of the damage parcel in question, and to which proceedings the claimants were parties. As already shown, the city did not, under the circumstances, take title in fee simple absolute with power to dispose of such lands; but the point has been apparently urged upon the theory that, as the claimants were parties to the earlier condemnation proceedings, they cannot take advantage of the situation created by the determination therein which had the effect of leaving their lands, now acquired in this proceeding, immediately adjacent to such space or roadway. Lewis, in his work on Eminent Domain, says:

"However absolute the fee of the public may have been, its devotion of the land to street uses and the express or implied invitation to abutters to improve their property with reference to the street would give rise to material rights and obligations which could not be abrogated at the will of either party. By acting upon the invitation to use the land as a street the abutters would acquire a right to have the space kept open as a street and to enjoy light, air and access therefrom." 1 Lewis on Eminent Domain, § 127.

The same principle was held operative in the Matter of City of N. Y. (Jerome Avenue) No. 1, 120 App. Div. 297, 105 N. Y. Supp. 319, where it was held that, upon the condemnation of the westerly half of a certain road now embraced within a certain avenue, the city, as the owner of adjacent property, acquired an easement of light, air, and access over the said westerly half of the road. From what has been said it clearly appears that the claimants acquired an easement of light, air, and access over such fire protecting space, subject, of course, to the right of the city to maintain it at all times as a fire clearance line and to the right of the public to use it in common with them. The extent of such easement may be further gathered from the testimony of Mr. Perry, already noted, that such fire protecting space was so laid out that people could walk upon it, back and forth, freely, just the same as if they were upon a regularly laid out street or lane of the city; and also from the testimony of Mr. John H. Friend, the architect employed by the claimants to draw plans and specifications for an apartment house to be constructed upon the damage parcel in question, and by which it appears that the department of bridges made no objection to the plans which show doors and show windows on such fire clearance space. Mr. Friend testified that in March, 1907, he had a conversation with Mr. Kingsley L. Martin, the engineer in charge of the Brooklyn and Williamsburgh Bridges, to whom the letter of the claim-

ants' attorneys relative to the restoration of the sidewalk on such fire clearance space was referred by Mr. Stevenson, who was then bridge commissioner, and that in the course thereof he (Friend) stated to Mr. Martin that he wanted to find out the plans and arrangements of the department of bridges as to such fire clearing space on the southerly approach, and that he (Martin) looked over the plans which he had prepared for the erection of a building on the damage parcel in question, as well as on the adjoining southerly parcel, and said, "We are going to have a sidewalk alongside of your house and a ' roadway. There will be about 28 feet between the house and the approach, and there will be a 10-foot sidewalk on the side," and that he would send him (Friend) "a blueprint showing just what is going to be done," which he did within a few days thereafter; that thereupon a second set of plans for the erection of an apartment house upon the damage parcel in suit was prepared, and which provided for show windows and doorways upon such fire protecting space or roadway, and, when shown to Mr. Martin, he said there was no objection on the part of the department of bridges to such a building upon that space or roadway. The corporation counsel contends that the easement asserted by the claimants was in effect attempted to be created orally in behalf of the city of New York through the agency of the commissioner of bridges' engineering staff, and consequently was unauthorized; but, as already seen, such fire protecting space was constructed by legislative authority, and the foregoing testimony of conversations had with members of such staff was admissible, not for the purpose of showing that they created such an easement therein, as claimed by the corporation counsel, but in order to show what the department of bridges did under the authority conferred by the amended act of 1899.

It is urged by the city that it was prejudicial error for the commissioners to admit in evidence the second set of plans, which was prepared after the above noted interview with Mr. Martin was had, but, as all the facts as to the condition of the property and its surroundings, its improvements and capabilities may be shown and considered in estimating its value, the point is not well taken. Matter of Armory Board, 73 App. Div. 152, 155, 76 N. Y. Supp. 766; Lewis on Eminent Domain (3d Ed.) § 706, p. 1231. As was said by the court in the Matter of Armory Board, supra, 73 App. Div., at page 155, 76 N. Y. Supp., at page 768:

"Undoubtedly the owner is entitled to compensation for his property on the basis of an award for the best use to which that property can be put, but it is the most available use to which it can be put in the form in which it exists at the time the property is taken or title is acquired thereto by the city."

The corporation counsel claims that the commissioners also erred in admitting evidence of an alleged speculative nature relative to the construction of a hypothetical building on the parcel in controversy and upon the parcel adjoining on the south occupied by Apollo Hall. It will be seen, however, upon a reading of the record, that the questions to which attention has been called were put to the city's expert on cross-examination for the purpose, as stated by the claimants' counsel at the time, to test such witness's knowledge and competency, and not to establish or intend to establish values. No question was asked the

witness relative to the possible cost of the construction of such an improvement, nor as to what the possible rental return for such a building as a whole would be. The testimony so elicited does not, therefore, come within the rule which prohibits the introduction of evidence of what unimproved property would earn if an apartment house were built thereon, because it involves elements of uncertainty and speculation. Matter of City of N. Y., Blackwell's Island Bridge, 118 App. Div. 272, 273, 103 N. Y. Supp. 441.

The corporation counsel further maintains that the commissioners erred in receiving proof of damages by reason of architects' fees incurred for drawing plans for the erection of a proposed tenement house improvement on the land taken in this proceeding, but, as they rejected the claim therefor, no harm was done in receiving such testimony. The owners made a claim of $3,500 as and for consequential damages to the portion of property remaining by reason of the taking by the city of the outside portion thereof. It appears from the second set of plans put in evidence by the claimants that they sought to improve the damage parcel in question by erecting thereon an apartment house limited to the area of such parcel, with store fronts on Clinton street and upon the adjoining fire protecting space. This would indicate that they did not rely upon any possible advantage which might be derived by them as owners of the adjoining Apollo Hall plot, and having thus chosen to base their claim for consequential damage upon the damage parcel in suit, and not upon the adjoining property, the claimants in my judgment are not entitled to consequential damage for the portion of the plot remaining by reason of the taking of the outside portion thereof. Matter of Armory Board, 73 App. Div. 152, 156, 76 N. Y. Supp. 766. The commissioners, however, allowed consequential damage, as appears by the following excerpt from the stenographer's minutes of the proceedings, viz.:

"The Chairman: Now, the commissioners have held heretofore that if there is any consequential damage, as they have held there was, they could not take into consideration the fact that you employed an architect and paid him a sum of money for preparing plans, because the plans entirely ignore the building for which you now claim consequential damage. Therefore, if consequential damage is allowed, the amount you desire to be paid for this architect must be ignored. If, on the other hand, we treat it with serious consideration and decide that the architect would be entitled to compensation for services rendered, we must ignore any damage which may have accrued by which the Apollo Hall building may suffer, for this reason: We have determined heretofore that, where you are entitled to consequential damage, you cannot recover for any amount you have paid to the architect. In other words, you cannot select both horns of the dilemma."

So far as I can gather from the foregoing remarks of the chairman of the commission and the testimony of the claimants' experts, the award for consequential damage is sought to be justified upon the theory that the "plottage" value of the remaining portions of the claimants' property (i. e., the Apollo Hall plot) has been lessened to the extent of 5 per cent. on the estimated value of such plot by reason of the taking of the damage parcel in this proceeding; in other words, if the latter had not been taken, the "plottage" value of the Apollo Hall plot would have been 10 per cent. instead of 5 per cent., which latter

percentage they testified was its "plottage" value at the time when the city acquired title. This difference in the "plottage" value amounts to about $3,500, the amount claimed by the owners for consequential damages as above stated, and, in view of the conclusion above reached, that consequential damage should not be allowed, I have concluded to deduct the last-mentioned sum from the amount awarded by the majority of the commissioners for the damage parcel in suit, and which said sum appears to have been allowed by them for such consequential damage.

We are now brought finally to the consideration of the question whether or not the award of the above-mentioned sum for the damage parcel in suit so made by a majority of the commissioners as above stated should be sustained. In view of these easements of light, air, and access which the claimants had in the fire protecting space or roadway adjoining their property when the city concluded to acquire a site for a police station, viz., in or about the month of May, 1907, it may be fairly held, in view of the circumstances disclosed, that the damage parcel in suit had all the elements of a corner and that the claimants are entitled to be compensated accordingly. Even if there was no right of access upon such fire protecting space or roadway from a building bordering thereon, there was nothing, so far as the record discloses, which would have prevented the putting in of windows overlooking it. This was an element of damage which the commissioners could have taken into consideration, even though they concluded that the claimants had no right to erect a building having doors opening upon such space or roadway. This latter view is supported by Matter of Amsterdam Avenue, 53 Misc. Rep. 342, 104 N. Y. Supp. 821, where it was held that a lot having a space of about 25 feet between it and the building on the adjoining property, giving it light and air on three sides, should not be treated as an ordinary inside lot, although the city owned the adjoining property and might build upon it. As already stated, the claimants' experts testified that the most northerly lot of the premises possessed many of the advantages of a corner lot, being at the junction of Clinton and Delancey streets, and having the space or roadway above mentioned immediately adjoining on the north, with nothing between it and the bridge structure. They both testified that they did not give it the same value they would have given, had it been a corner lot in the legal sense of the term, and that, had they so regarded it, their estimate would have been correspondingly higher. On the other hand, the city's experts considered the outside lot of the plot in question as an ordinary inside lot on Clinton street, having a slight advantage over lots facing such street because of having light and air along its northerly lines. The measure of compensation is the market value of the property at the date of vesting of title in the municipality (In re Block bounded by Avenue A, etc., City of N. Y., 122 N. Y. Supp. 321), and the market value of property includes its value for any use to which it may be put (2 Lewis on Eminent Domain [3d Ed.] § 707, p. 1233). Taking into consideration then all the possible uses to which the damage parcel in suit might have been put, and its condition and surroundings when the city acquired title and that it had for all practical purposes all the advantages

and elements of a corner, and measuring its value at that time by the rules above mentioned, the amount awarded cannot be said to be excessive or otherwise improper, after deducting therefrom the said sum of $3,500.

The report must, however, be referred back to the same commissioners in order that they may revise and correct it, so as to deduct from the sum finally awarded, viz., $141,308, the said sum of $3,500, so that their final award will be the sum of $137,808, instead of the said first-mentioned sum of $141,308. The commissioners will also make the necessary corrections as to the sums awarded to the individual owners of such damage parcel.