THE BROOKLYN PARK COMMISSIONERS, Respondents v. JAMES ARMSTRONG, Appellant.

In the exercise of the right of eminent domain, the legislature are the sole judges to what extent the public use requires the extinguishment of the owner's title, and their power in this respect (subject always to the necessity of making full compensation) is not limited by any constitutional restriction. The nature of the right acquired by the public in such cases, whether an absolute title to, or a mere easement in the lands, depends, therefore, upon the intention of the legislature, to be deduced from the act authorizing the condemnation.

A municipal corporation, was, by an act of the legislature, authorized to take lands for a public park, and the act declares, that the lands so to be taken, shall be a public place; and provides that in ascertaining the compensation to be paid the owners, a just and true estimate of the value of the lands is to be made, together with the tenements, hereditaments and appurtenances, privileges and advantages to the same belonging, without deduction for benefits and advantages; and declares that on fulfilling the requirements of the act, the lands shall vest forever in the city, and that whenever the city shall become vested with the title to the park, as provided, it might sell any building improvements or other material thereon; and authorizes the issue of bonds by the city, to obtain the fund to pay for the lands taken, declaring the lands pledged for the payment of such bonds.—*Held*, that the city acquired an absolute estate in the lands taken under this act and not an easement, and that such title was free from any legally recognizable reversionary right in the owners.

The title of the city, thus acquired, is impressed with a trust to hold the lands for the public use as a park, and it cannot, of itself, convey or dispose of them in contravention of the trust; but it is within the power of

the legislature to relieve the city from such trust, and to authorize a sale, free therefrom.

The right to discontinue the public use of land thus taken and to sell it to private parties, under the sanction of the legislature, exists, notwithstanding the fact that such abandonment and sale, will lessen the value of surrounding property, which has been assessed for the benefit and advantage to it, from the maintenance of such use. There is no contract in such cases, with the owner of such adjacent property to maintain the use.

Bonds having been issued and used to raise funds for the compensation paid for the land.—*Held,* that the terms of the act and the issue of the bonds, constituted a contract between the bondholder of the one part, and the city and the State on the other, specifically pledging the land taken for the payment of the bonds, and that a subsequent act of the legislature, authorizing a sale of any portion of the park free of all liens existing by virtue of the original act, was in violation of the federal constitution, as impairing the obligation of contracts.

*Held,* further, that a provision that the avails of the sales so authorized, should be held as a sinking fund, for the redemption of the bonds when due, did not avoid the objection.

If a purchaser may sometimes be compelled to take a title, free from reasonable doubt, notwithstanding an objection not certainly and beyond all possible question unfounded; yet when it is ascertained that there is a defect, he may refuse, however remote the probability of his ever being incommoded thereby.

(Argued March 16th, and decided March 28th, 1871.)

APPEAL from a judgment of the General Term of the Supreme Court in the Second department, rendered in favor of the plaintiffs, in a controversy submitted under section 372 of the Code.

The plaintiffs representing the city of Brooklyn, acquired by the right of eminent domain, a certain tract of land in that city for a public park. They sold one lot of the tract to the defendant, who refused to take the title, on the ground that the city had not the power to convey a clear title in fee, free from all incumbrances; and this action was brought as a test case to try the title.

By an act of the Legislature (chap. 466, Laws of 1859), John Greenwood and others were appointed commissioners to select and locate grounds for a park, in or adjacent to the city of Brooklyn, and to report to the next Legislature.

They made their selection and reported to the Legislature of 1860, which passed an act (ch. 488, Laws of 1860), amended in 1861 (chap. 340), by which a board of park commissioners was appointed, and a tract of land lying on both sides of Flatbush avenue, was declared from and after the passage of the act, to be deemed to have been taken by the city for public use, as and for a public park, and to have been opened as a public place, with the same effect as if the whole of the same had been taken and declared open under the provisions of the charter of the city (ch. 144, Laws of 1850), except as otherwise provided by the act.

Commissioners of estimate and assessment were to be appointed by the Supreme Court, in the manner provided by the act relative to Fort Green (ch. 142, Laws of 1847), who were directed to "make just and true estimate of the value of the lands, and of the loss and damage to the respective owners, lessees, parties and persons respectively entitled thereto, or interested in the same, together with the tenements, hereditaments and appurtenances, privileges or advantages to the same belonging, or in anywise appertaining, by and in consequence of relinquishing the same to the said city" (§ 4), which amounts were to be due and payable immediately upon the confirmation of the report. (§ 6.)

The report was declared to be final and conclusive upon the city, the owners and all other persons, "and upon the confirmation of any such report, and upon payment being made to the owners of the lands in such report mentioned, or upon their assent thereto by deed duly executed, the said lands" were to "vest forever in the city of Brooklyn, for the use and purposes in this act mentioned." (§ 8.)

Bonds of the city were to be issued to pay the awards, and the lands taken by virtue of the act were specifically pledged for their payment (§§ 10 and 12), and bonds subsequently issued are still outstanding and unredeemed.

In 1865 an act was passed (ch. 603), entitled "An act to change the boundaries of Prospect Park in the city of Brooklyn," authorizing the commissioners to acquire, for the pur-

poses therein mentioned, an oval shaped piece of land for an entrance to the park. (§ 1.)

It provided that this land, as well as all other lands mentioned in the act of 1861, should, "from and after the passage of this act, be deemed to have been taken by the city as and for a public park, and the commissioners' map shall be altered to correspond therewith." (§ 2.)

Commissioners were to be appointed, as before, to estimate the value of this land, " and also all the estate, right, title and interest in all other lands heretofore taken by the act of 1861, remaining in the owners thereof, and the loss and damages to be sustained by them in consequence of their relinquishing the same to the city." (§ 3.)

"And the title of the lands mentioned in (their) such report shall, after such confirmation, vest forever in fee simple absolute in the said city of Brooklyn, and the said lands shall thenceforth form part of Prospect Park." (§ 5.)

For the payment of the awards and the redemption of the bonds issued under this act and the act of 1861, " all the lands embraced within the boundaries of the said park, including those now taken, are hereby specifically pledged." (§ 6.)

That part of the land lying east of Flatbush avenue was never used or improved as a park.

In 1870 an act was passed (chap. 373) entitled "An act to authorize the improvement and sale of certain portions of Prospect Park, in the city of Brooklyn." It authorized the commissioners, for and in behalf of the city, to sell the land east of Flatbush avenue (§ 1), by deeds, with or without warranty, which deeds should vest in the grantees an absolute title in fee simple. (§ 2.)

The proceeds of sales to be devoted to the sinking fund for the redemption of park bonds. (§ 3.)

After deeds are given, " all liens, rights and claims by way of easement or otherwise into, over or upon the lands, arising out of or founded upon an act passed May 2d, 1861, entitled, &c., or of any act amendatory thereof, shall be terminated and extinguished." (§ 4.)

The case states that this act was passed " in order to furnish a better and more satisfactory security for said bonds."

In pursuance of this act the commissioners sold one lot to the defendant, who refuses to take the title, alleging that the act is unconstitutional, and that neither the city nor the commissioners can give a valid title to the fee, free from all incumbrance.

*Samuel Hand* and *William W. Goodrich*, for the appellant, that the city did not acquire an alienable fee under the act of 1861, cited: (*Albany street*, 11 Wend., 151 ; *John* and *Cherry Streets*, 19 Wend., 659 ; *Varick* v. *Smith*, 5 Paige, 137 ; *Bloodgood* v. *Mohawk R. R.*, 14 Wend., 51 ; *Dunham* v. *Williams*, 36 Barb., 162 ; *Hooker* v. *Turnpike Co.*, 12 Wend., 371 ; *Wilkinson* v. *Leland*, 2 Peters, 657 ; *Embury* v. *Conner*, 3 Comst., 511 ; *Beekman* v. *Saratoga R. R Co.*, 3 Paige, 73 ; *Cincinnati* v. *Lessees of White*, 6 Pet., 438 ; *Trustees of Watertown*, v. *Cowen*, 4 Paige, 510 ; *Dumond* v. *Sharts*, 2 Paige, 184 ; *Jackson* v. *Hathaway*, 15 Johns., 453 ; *Hains* v. *Elliott*, 10 Pet., 25 ; *Mahon* v. *N. Y. C. R. R.*, 24 N. Y., 66 ; *People* v. *Kerr* ; 27 N. Y., 188 ; *Anderson* v. *Rochester R. R. Co.*, 9 How., 553 ; *Townsend* v. *Morris Co.*, 6 Trans. Appls., 269.) That the act of 1870, in authorizing a sale clear of incumbrances, impaired, or attempted to impair the contract with the bondholders as to the security, they cited *Trustees of the Wabash Canal Co.* v. *Beers* (2 Black., 448). That the city having assessed adjacent owners to the park on the increased value of their lands from the benefits of the park, it could not now lessen the value by abandoning and selling the park, and that they were estopped from so doing, having filed maps showing the park, and thereby induced purchases of adjacent lands. They also cited cases as to the unconstitutionality of the act of 1865, but the question was not passed upon by the court.

*Joshua M. Van Cott* and *Henry C. Murphy*, for the respondents. That the estate taken by the city, under the act

of 1861, was an absolute fee and alienable by the consent of the legislature, they cited: (*Heyward* v. *The Mayor, etc.,* 7 N. Y. R., 314; *Rexford* v. *Knight,* 11 N. Y., 314; *Dingley* v. *The City of Boston,* 100 Mass. R., 544; *De Varaigne* v. *Fox,* 2 Blatch., 95; *Embury* v. *Conner,* 3 Comst., 511; *Matter of Water Com'rs* v. *Lawrence,* 3 Edw., Ch. R., 552; *In re Townsend,* 39 N. Y., 171; *Nicoll* v. *N. Y. & Erie R. R.,* 12 N. Y., 121; *Wardell* v. *People,* 8 Wend., 183; *Gould* v. *Hud. R. R. Co.,* 6 N. Y., 522; *Darlington* v. *The Mayor,* 31 N. Y., 164, 193; *East Hartford* v. *Hartford Bridge Co.,* 10 How. U. S., 511

FOLGER, J. The act of 1861 conferred upon the city of Brooklyn the power of acquiring a right in the lands in question in this case. By the proceedings under the act, the city did, in fact, obtain all the interest and title which, by the terms of the law, it was empowered to acquire. The just compensation to the private owner was awarded; the award was confirmed by judicial authority; the sum of it paid to him, and by him accepted. His acceptance was a renunciation of the constitutional provision made for his benefit, and an assent to the taking of the land, even if there were any question as to the validity of the act, or any irregularity in the proceedings under it. (*Embury* v. *Conner,* 3 N. Y., 511–518.) But, neither by such renunciation, nor without it by proceedings under the statute, could the city obtain a right more extensive than it was authorized by the statute to acquire. The act of the owner, in accepting the awarded compensation, could not be made broader than the provisions of the law to which he thereby assented; nor could the city, by proceedings under it, reach a title greater than it conferred the power of acquiring. From the interpretation of the statute itself, then, must be found the extent of the right of the city in the lands taken.

The main object of the act is to provide for the city of Brooklyn, its people and the public, a park. Lands taken for such purpose are taken for a public use. (*Owners, etc.,* v.

*Mayor, etc., Albany,* 15 Wend., 374.) But, in the idea of a public park is comprehended more, than a use, either occasional or limited by years, or susceptible of coexistence with a private right capable of concurrent exercise. The words suggest more, than an open extensive area of land, to be passed over or but temporarily occupied by the public, and on which any private person may still do acts of ownership. To create a public park an extensive area is needed; but the area must be improved, and in various processes, alterative and subversive of natural formation, must much money be absorbed, and many years must go by before it is complete. And so costly, so extensive, so peculiar in character, and so undisturbed by interference, must be these processes and the results of them, as that there is need of permanency and exclusiveness of public possession and control, as against the exercise of any private right therein. Of itself then, the power to take lands for a public park, unless limited by the terms in which it is given, would, to a large degree, carry with it the right to acquire the largest title in the lands taken. That the extent of the right acquired in lands by the taking of them for public use depends, in some measure, upon the needs for which they are taken, is recognized and applied in this court, in *The People* v. *Kerr* (27 N. Y., 288–201, *et seq.*); see, also, *Heyward* v. *The Mayor, etc., of New York* (7 id, 314–325).

This, of itself, however, is not conclusive. But, when we advert to the terms in which the power given by this act is expressed, we find that the city is authorized to take title to the lands themselves. They are declared "to be a public place" (§ 1); "to be deemed to be taken for public use, as and for a public park" (§ 2); in ascertaining the just compensation to be paid to the private owner, "a just and true estimate of the *value of the lands* is to be made, and of the loss and damage to the respective owners, together *with the tenements, hereditaments and appurtenances, privileges and advantages to the same belonging,* by and in consequence of *relinquishing the same* to the city, without deduction for any supposed benefits or advantages" (§ 5); on fulfilling the require-

ments of the act, "*the lands shall vest forever* in the city"
(§ 8); "whenever the city shall have become *vested with the
title to said park,* as in the act provided, it *may sell any build-
ings,* improvements or other materials not required for the
purposes of the park or for public use" (§ 20); the city is
authorized to issue bonds to obtain the moneys to pay for the
lands taken, and *the lands are,* by the act, *pledged for the
payment* of those bonds (§§ 9, 12). The terms employed in
the fifth section, descriptive of what is to be acquired and
paid for, are broad, and would seem to include all of a propri-
etary nature in the lands, or connected with or growing out
of them. And for relinquishing it all, the owner is to be paid
the full value of it all, without deduction. It seems incon-
sistent, that if the legislature intended that the city should
take but an easement, it should be required to pay the value
of the lands, and of all hereditaments and appurtenances, and
also the other loss and damage to the owner from the taking,
without deduction for benefit. This would be to exact the
price of the fee, for taking a user only. It could not have
been intended that the owner should receive full value, and yet
have left to him a reversionary interest. (*Haldeman* v. *The
Penn. Cent. R. R. Co.,* 50 Penn. St., 425–437; Cooley on
Lim. Leg. Pow., 552.)

The power given, to sell buildings improvements and
materials not needed for the public use, is one not consistent
with the idea of an easement merely, a restricted right of
user only. So the phrases which vest the lands and the title
to the park forever in the city, are creative of a right, not
limited by time or particular use, and are indeed essential to
make operative the pledge of the lands to the creditor of the
city holding these bonds. It would be entirely nugatory to
pledge to a creditor an easement, a right of public use, which
would expire the instant that by the enforcement of the pledge
he had cut off the public use, extinguished the general ease-
ment, and made it so far as possible, his private and exclusive
property. The legislature meant to give the creditor a lien
upon these lands. That this could not be done, unless the

city, the debtor, had more than a right of public use in them, draws strongly to the conclusion that the legislature gave the power to acquire a title.

Language may be broad enough to vest an absolute title to lands, without being technical in its terms. If the expressions are such as that the whole force of them is not applied, unless a fee simple is created, that estate will be taken, though the exact words be not used. Thus, in *Rexford* v. *Knight* (11 N. Y., 308), it was held that the State had acquired an estate in fee in certain lands. It was said on the argument of the case now at bar, that the statute under which the lands in that case were taken, gave in express terms, the fee simple to the State. It is true that chap. 262, § 3, of Laws of 1817, and § 52, 1 R. S., 226, are thus explicit. But the claim in that case (*N. Hill, Jr.*, for the respondent, arguendo, page 311), was put upon the provisions of § 49, 1 R. S., 226, and so was the judgment of the court. (Pp. 312, 314.) The language of the section last referred to, is: " And the premises so appropriated *shall be deemed the property of the State.*" And the court, says : " The language employed is so broad, as to require a fee 'simple." So in *Dingley* v. *The City of Boston* (100 Mass., 544), an authority to " purchase or otherwise take lands," and a declaration that " the title to all lands so taken should vest in the city," was held to vest a title in fee simple in the defendants. See also *The Commonwealth* v. *McAlister* (2 Watts, 190) ; *Union Canal Co.* v. *Young* (1 Whart., 425) ; 50 Penn. St., *supra.* When the fee is taken from the former owner, it must be held, that he is fully compensated at the time of the original taking, and that the possibility that the land may at any future time revert to him by the cessation of the public use, is too remote and contingent to be considered as property at all. (*Heyward* v. *The Mayor, supra.*)

Having determined that the act of 1861 conferred upon the city the power of acquiring an absolute estate in the lands, it is not necessary that we go into the inquiry whether the statute of 1865 be a valid act or not.

It is to be observed that the act of 1861 vested the lands in the city of Brooklyn forever, but for the uses and purposes in that act mentioned. Though the city took the title to the lands by this provision, it took it for the public use as a park, and held it in trust for that purpose. Of course, taking the title, had it taken it also free from such trust, it could have sold and conveyed it away, when and as it chose. Receiving the title in trust for an especial public use, it could not convey without the sanction of the legislature; and the act of 1870 expresses the legislative sanction. Under its provisions (Laws of 1870, ch. 373, p. 848), it is authorized to sell and convey, with covenants, certain portions of the lands taken (§ 1), of which the premises in question in this case are a part. It was within the power of the legislature to relieve the city from the trust to hold it for a use only, and to authorize it to sell and convey. (*Nicoll* v. *New York & Erie R. R.*, 2 Kern., 121.) Doubtless, in most cases, when land is condemned for a special purpose, on the score of public utility, the sequestration is limited to that particular use. But this is where the property is not taken, but the use only. Then, the right of the public being limited to the use, when the use ceases the right ceases. Where the property is taken, the owner paid its true value, and the title vested in the public, it owns the whole property, and not merely the use; and, though the particular use may be abandoned, the right to the property remains. The property is still held in trust for the public by the authorities. By legislative sanction it may be sold, be changed in its character from realty to personalty, and the avails be devoted to general or special public purposes. (*De Varaigne* v. *Fox*, 2 Blatchf. C. C., 95.)

The appellant's counsel insists that the operation of the acts of 1861, and of 1870, in the practical result, is to take the property of one person and transfer it for the profit of the city to another. Such is not, however, the direct and necessary, nor was it the intended or anticipated, operation of the act of 1861. That was passed in good faith by the legislature, to meet a public necessity. The authority to determine upon

the necessity of the exercise of the power of taking private property for public use rests with the State. It ordinarily acts in this matter through the legislative department of the government. The legislature is the proper body to determine the necessity of the exercise of the power, and the extent to which the exercise of it shall be carried. And there is no restraint upon the power, save that requiring that compensation shall be made. (*The People* v. *Smith*, 21 N. Y., 597.)

When the legislature has indicated the existence of what is acknowledged to be a public use; has declared the necessity of the taking for that use, and its extent; has restricted the taking to the extent declared; and has provided for the ascertaining and the due payment of just compensation, the judicial power may not question its decision. It is only when the limits have been exceeded, or its authority has been abused or perverted, that the judiciary may restrain. (*Hazen* v. *Essex Co.*, 12 Cush., 477.)

That the legislature erred, in 1861, in the exercise of this power, and mistook a seeming for a real necessity, does not render its further action in 1870 invalid. Under the act of 1861, all the steps were taken for the appropriation of the lands and the payment therefor. At once, on the appropriation, the owner became entitled to the compensation for them. His right to the price was complete. (*The People* v. *Hayden*, 6 Hill, 359.)

And the rights were reciprocal. The public had the right to the lands on making payment, and as soon as the owner was paid he was disseised. There is no reverter. They were the property of the city of Brooklyn. The legislature could discharge it from the trust to hold them for a park, and empower it to sell. It has done so, and, so far as any express limitation in our State constitution is concerned, it had the power to do so.

The appellant claims, that the city is estopped by its own acts from selling any part of the land; that the plotting and filing of maps made a *quasi* contract between the city and the bondholders and individuals that the whole land should

always be a park ; and that the value of neighboring property having been enhanced in anticipation of the creation of this park, and greater assessments and taxes upon that property having thereby been made and paid, such taxation is in the nature of a contract, and the city cannot now sell any of its land.    We apprehend that this point is not well taken.

If a street be discontinued and the value of lands abutting on other parts of it, and on neighboring streets is lessened, it is not such an injury to the owner as to entitle him to damages.    (*Smith* v. *City of Boston*, 7 Cush., 254.)

The city of Brooklyn was not the grantor of the neighboring owner, and did not induce him to buy of it, by a purpose declared, of creating this park.    Any enhanced value of his property, was an incidental benefit to him, in its greater readiness of sale, at a greater price, and any depreciation in value, is an incidental detriment.    The same results flow, in greater or less degree, from the commencement or abandonment of any of the measures of municipal enterprise whether general or local.    It would be going too far, to hold, in the absence of any direct and particular relation between the city and the owner of real estate, that a projected work having influenced for the better the value of his property, he could forbid the abandonment of it, or that there existed any enforceable right, if it was abandoned.

Any proper exercise of govermental power which does not directly encroach upon the property of an individual, or disturb him in its possession or enjoyment, will not entitle him to compensation, or give him a right of action.    (*Gould* v. *Hud. R. R. R.*, 6 N. Y., 522.)    Hence no obligation rests upon the government not to exercise its power in such manner.    Familiar examples of this, are the changes of the grades of streets in cities and villages, by which lands adjoining are lessened in value.    (*Radcliff* v. *The Mayor*, 4 N. Y., 195 ; *Wilson*, v. *The Mayor*, 1 Denio, 595.)    The general good is to prevail over partial individual inconvenience. (*Lansing* v. *Smith*, 8 Cow., 149.)    This is the rule when public works for the general welfare are entered into.    It is not

different when works projected are, for the general good, abandoned before completion or commencement.

This act of 1870 directs that the moneys received upon such sale shall be paid over to the commissioners of the sinking fund of the city, to be held for the redemption of the bonds issued in payment of the lands taken. (§ 3). And, further, that upon the delivery of the deeds on such sale, all liens existing by virtue of the act of 1861, shall be terminated and extinguished. (§ 4.)

It is claimed, by the appellant, that the enactment contained in the fourth section is in conflict, with the federal Constitution, in that it impairs the obligation of the contract by which these lands are pledged for the payment of the bonds issued for the lands taken. (U. S. Const., art. 10, § 1, sub. 1.)

The legislature when it declared, in the act of 1861, that these lands were pledged for the payment of these bonds, did thereby agree with whoever parted with his money and took a bond, that he should have, as an assurance for the payment of it, the security of these lands. It was not merely a restriction upon the power of the city. It was an obligation creating a lien. It agreed with the creditor, itself, and fastened upon the city the same agreement, that for the money received from him he should have these particular lands as a specific security for repayment. If section 4 of the act of 1870 is a valid enactment, it takes away from the holder of these bonds part of the security which he has for their payment. It is no answer to this to say that there is still pledged to him the land reserved for streets, avenues, or other purposes. Such reply is only as to the degree, and not as to the fact, of the impairing the obligation It is no answer to say that the avails of the sale will be turned into the sinking fund for the use of the bondholders. The holder of the bond did not agree to take a security upon a fund in the city treasury, and incur any risk of its preservation, but stipulated for a specific lien upon this land. (See *Curran* v. *State of Arkansas, infra,* p. 319)

Nor is there here any application of the reserved power of the legislature to alter or amend the charter of the city. This

is a contract not between the city and the State, but between the creditor of the one part and the city and the State of the other. No power has been reserved, either in constitution or otherwise, to alter that contract.

That it was an important matter to have these lands pledged for the payment of these bonds, is sufficiently shown by the solemnity with which the pledge is made, an enactment of the legislature being sought to so specifically declare it. It is an essential element in the obligation of the city, which the creditor received in exchange for his money. This act takes that element away and thus impairs the obligation. True the entire contract is not destroyed. The liability to pay still remains. But the pledge of tangible property as a security that the liability would be met has been withdrawn. It was on the assurance that this should remain, that the creditor was induced to take the bonds, and give in exchange his property. This was a contract. The security cannot now be taken away without impairing the obligation of that contract. (*Curran* v. *The State of Arkansas*, 15 How., U. S., 304–314; *McGee* v. *Mathis*, 4 Wallace, 143; *Wabash, &c. Co.* v. *Beers*, 2 Black; 448.)

It follows that the act of 1870, so far as it assumes to discharge the lands from the lien, is in conflict with the constitution of the United States. The parts of the statute not obnoxious to this objection may be upheld. But as the provisions of the law which discharges the lien are those upon which it is relied to remove the encumbrance upon the premises, and as, without them, the city cannot give such a title as the act authorizes it to pass, and as the purchaser has agreed for, they are of no avail to the respondents in this controversy.

It is true that the danger to the purchaser, to all seeming, is very slight, and very remote, that the premises for which he has contracted will ever be called upon to contribute to the payment of these bonds. The probabilities are, that with the wealth concentrated within the corporate bounds of the city of Brooklyn, and with the means at its command, it will always find the ordinary means of raising money by taxation,

sufficient for the purpose of payment of interest, and the method of a new loan at any time available to pay the principal. But yet there is the possibility. The debt is an encumbrance upon this land, and does affect that for which the appellant bargained. This is a legal certainty. However strong the probability that the debt will never be exacted from the land, it cannot be asserted to be more than a probability. While it exists there is, as matter of law and matter of fact, the possibility that the creditor may enforce his lien. And this hampers the estate. It may be conceded that a title free from reasonable doubt may be forced upon an unwilling purchaser. Thus, in a case in which it appeared that there was in a prior deed, a reservation of mines, specific performance was decreed, not because there being mines it was not probable that the right reserved would ever be exercised, but because, 1st. The court saw upon examination the probability was great that there were no mines for the right reserved to act upon. 2d. That all legal right to exercise it had ceased. But this is a doubt whether there exists, in law or in fact, any defect in the title. When it is ascertained that there is an existing defect in the title, the purchaser will not be compelled to perform on the allegation that it is doubtful whether the defect will ever incommode him. If there be any reasonable chance that some third person may raise a question against the owner of the estate after the completion of the contract, the court considers this a circumstance which renders the bargain a hard one for the purchaser, and one which it will not, in the exercise of its discretion, compel him to execute. (*Seaman* v. *Vawdrey*, 16 Vesey, 390.) We are not able to hold that a good title in fee to the premises, can be acquired by the respondent, under and by virtue of the acts, proceedings and sale.

The judgment of the courts below must be reversed, with costs to the respondent.

All the judges concurring.

Judgment reversed and judgment ordered for the defendant.