BRILL v. MILLER, Superintendent of Buildings, et al.

(Supreme Court, Appellate Division, First Department.   November 18, 1910.)

1. MUNICIPAL CORPORATIONS (§ 631*)—BUILDING REGULATIONS.
    Building Code, § 109, makes the regulations thereof applicable to every theater "hereafter erected," and section 109a provides that section 109 shall not apply to any theater "now erected." A building used as a theater was separated by a solid wall from dwelling or tenement houses back of it, and plans which the building department intended to approve contemplated the removal of the wall and demolition of the houses and the erection on the site of the houses of a new building to be connected with the theater; the two structures together constituting a single building to be used as a theater. *Held*, that the plans did not contemplate a mere alteration and were not within the exception of section 109a.
    [Ed. Note.—For other cases, see Municipal Corporations, Dec. Dig. § 631.*]

2. WORDS AND PHRASES—"ALTERATION."
    An "alteration" is generally understood as meaning a change or changes within the superficial limits of an existing structure, or a change of form or state which does not affect the identity of the subject.
    [Ed. Note.—For other definitions, see Words and Phrases, vol. 1, pp. 360–365.]

3. MUNICIPAL CORPORATIONS (§ 993*)—TAXPAYER'S ACTION.
    General Municipal Law (Consol. Laws, c. 24) § 51, authorizes an action by any taxpayer against any municipal officer to prevent any illegal official act or to prevent waste or injury to funds or estate of the municipality. *Held* that, in order for a taxpayer to maintain an action under the statute, he need not show special damage, and it is immaterial whether he is influenced by personal or selfish motives.
    [Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 2158–2161; Dec. Dig. § 993.*]

4. MUNICIPAL CORPORATIONS (§ 993*)—TAXPAYER'S ACTION.
    General Municipal Law (Consol. Laws, c. 24) § 51, authorizes an action by any taxpayer against any municipal officer to prevent any illegal official act or to prevent waste or injury to funds or estate of the municipality. The original taxpayer's act (Laws 1872, c. 161) contained no provision for an injunction to prevent a threatened illegal official act merely because it was unlawful, nor does Code Civ. Proc. § 1925. *Held*, that a taxpayer may maintain an action to prevent the superintendent of buildings of the city of New York from approving plans not in conformity with the Building Code, though such approval would produce no waste or injury of public property or funds.
    [Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 2158–2161; Dec. Dig. § 993.*]

    Laughlin, J., dissenting.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Appeal from Special Term, New York County.

Action by Solomon Brill against R. P. Miller as Superintendent of Buildings of the Borough of Manhattan, New York City, and others. Appeal by plaintiff from an order denying a motion for an injunction pendente lite. Reversed.

Argued before INGRAHAM, P. J., and LAUGHLIN, CLARKE, SCOTT, and MILLER, JJ.

A. S. Gilbert, for appellant.

J. P. O'Brien, for respondent Miller.

Seldon Bacon, for respondents Schinasi and Automatic Vaudeville Co.

SCOTT, J.   This is a taxpayer's action for an injunction to restrain the defendant Miller, superintendent of buildings of the borough of Manhattan, from approving plans for the erection of a building now said to be used as a theater.   The questions involved call for a consideration of sections 109 and 109a of the Building Code, which went into effect in 1899 and superseded all earlier building laws relating to the city of New York.   At the time the Building Code went into effect, there had been erected and was in use on the lots known as Nos. 134 and 136 East Fourteenth street, a building used in part as a place of amusement, and in part as a hotel, restaurant, and barroom.   The building extended southwardly towards Thirteenth street, about 116 feet, and at its southerly end was a platform or stage, on which dancing and singing performances were given, although the usual stage appurtenances, such as shifting scenery drops, dressing rooms, and the like, do not seem to have been present.   This building was separated by a solid wall from dwelling or tenement houses fronting on Thirteenth street, to which street there was also an exit by means of an alleyway.   The plans which the superintendent of buildings expresses his intention of approving, unless restrained, contemplate the removal of the wall now separating the Thirteenth street and the Fourteenth street buildings, the demolition of the houses now fronting on Thirteenth street, and the erection upon the Thirteenth street site of a new building to be connected with and used in conjunction with the present Fourteenth street building, so that the old Fourteenth street building and the new Thirteenth street building will together constitute a single building to be used as a theater.   The stage, dressing room, etc., will be in the new part of this building, and the auditorium will be partly in the old part and partly in the new.   Section 109 of the Building Code contains detailed and stringent provisions as to the manner in which theaters must be constructed in this city, all of which are designed to afford protection to the public who attend them.

It is conceded that the building intended to be produced by the combination of the old Fourteenth street building and the new Thirteenth street building will not comply with the law.   The superintendent of buildings undertakes to justify his proposed action by the following provisions of the Building Code:

"Sec. 109. Theaters and Places of Public Amusement.   Every theater or opera house or other public building intended to be used for theatrical or

operatic purposes, or for the public entertainment of any kind, hereafter erect-
ed for the accommodation of more than three hundred persons shall be built
to comply with the requirements of this section. No building which, at the
time of the passage of this Code is not in actual use for theatrical or operatic
purposes, and no building hereafter erected not in conformity with the require-
ments of this section, shall be used for theatrical or operatic purposes, or for
any public entertainments of any kind, until the same shall have been made
to conform to the requirements of this section. * * *

"Sec. 109a. The provisions of the foregoing section shall not be construed
to mean or made to apply to any theater, opera house or building intended to
be used for theatrical or operatic purposes now erected or for which plans
have heretofore been approved by the superintendent of buildings."

His contention is: That the Fourteenth street building was, when
the Building Code went into effect, a "theater, opera house or building
intended to be used for theatrical purposes"; hence it need not comply
with the stringent provisions of section 109, but might continue to
be used as it had been. That the erection of the new structure and its
combination with the old one was a mere alteration of the older build-
ing. And that the practically new theater to be formed by the com-
bination of the old and the new buildings must be considered a
"theater, etc.," actually in use in 1899.

This contention is unreasonable and untenable. Passing the very
doubtful question whether the Fourteenth street building ever was a
theater or opera house, or anything more than a saloon to which
patrons were attracted by singing and dancing, it seems to be clear
to the point of demonstration that, if the plans in question are carried
out, the old building will completely lose its identity, and the result
will be the erection of a new and much larger theater constructed in
defiance of existing laws. This will amount to much more than a mere
"alteration," which is generally understood as meaning a change or
changes within the superficial limits of an existing structure, or a
change of form or state which does not affect the identity of the sub-
ject. Century Dict.; Black River Imp. Co. v. Holoway, 87 Wis. 590,
59 N. W. 126; Davenport v. Magoon, 13 Or. 7, 4 Pac. 299, 57 Am.
Rep. 1; State v. Warren R. Co., 29 N. J. Law, 353. The result of
carrying out the plans, as proposed, would be that a building wholly
unauthorized by the Building Code would be erected and used as a
theater. Such a building would be unlawful, and, if the superintend-
ent of buildings approves the plans and permits the structure to be
erected, he will unquestionably violate his duty and thus perform an
"illegal official act," for "that cannot be legal which is forbidden by
law." Peck v. Belknap, 130 N. Y. 394–398, 29 N. E. 977. Having
arrived, without hesitation, at the conclusion that the approval of the
plans by the commissioner of buildings would be unlawful, the more
difficult question arises whether or not it is such an "illegal official
act" as may be enjoined at the suit of a taxpayer. The statute under
which the action is brought now constitutes section 51 of the general
municipal law (Consol. Laws, c. 24), being derived from chapter 531,
Laws 1881, as amended by chapter 673, Laws 1887, and chapter 301,
Laws 1892. It authorizes an action by any taxpayer, qualified as pre-
scribed by the statute, against any officer, agent, commissioner, or other
person acting in behalf of any municipal corporation "to prevent any

illegal official act on the part of any such officers, agents, commissioners or other persons, or to prevent waste or injury to, or to restore and make good property, funds, or estate" of said municipality. It is not questioned that plaintiff brings himself within the terms of the statute as a taxpayer qualified to sue, and it is therefore immaterial whether or not be shows special damage, or whether or not he is influenced to bring the action by some personal or selfish interest.

The statute provides both for prevention and for reparation, and, as pointed out in Tompkins v. Pallas, 47 Misc. Rep. 309, 95 N. Y. Supp. 875, it authorizes an action by a taxpayer either (1) to prevent an illegal act, or (2) to prevent waste or injury to the public property or funds. To justify an injunction it is not necessary that both illegality and waste or injury are threatened. Either is sufficient. Thus in Ziegler v. Chapin, 126 N. Y. 342, 27 N. E. 471, which was an action to annul a contract for the purchase by the city of Brooklyn of the property and franchises of a water company, no fraud or collusion was charged, and the court expressly found that the complaint contained no sufficient allegation of waste; yet an injunction was upheld upon the sole and specific ground that the city officers had no power under the law to make such a contract, and therefore the attempt to do so was an illegal official action.

The mere illegality therefore of the proposed action by the superintendent of buildings is sufficient to justify the injunction, if his threatened act is one of those which the statute was designed to reach. It is strongly urged upon us that the only illegal official acts which may be thus enjoined are those which threaten or may produce waste or injury of the public property or funds, and that the approval of the plans, even if unauthorized and illegal, does not threaten such waste or injury. The original taxpayer's act (chapter 161, Laws 1872) contained no provision for an injunction to prevent a threatened unlawful official act merely because it was unlawful, nor does section 1925, Code Civ. Proc. The purpose of inserting such a provision in the act under which this action is brought was to place a taxpayer in a position where he can, before the intervention of vested rights and the equities of third parties, challenge the legality of the acts of public officials. The statute assumes that any illegal official act is or may be injurious to the corporation when done by its servant, and allows him to be restrained simply because of its illegality. Warrin v. Baldwin, 105 N. Y. 534, 12 N. E. 49; Queens County Water Co. v. Monroe, 83 App. Div. 105, 82 N. Y. Supp. 610. It was explained in Rogers v. O'Brien, 153 N. Y. 357, 47 N. E. 452, that it could not have been the intention of the Legislature to draw into preventive jurisdiction, in equity, at the instance of any taxpayer, every proposed illegal official act, and it was said that to justify an injunction it should appear that the proposed act not only was illegal, but involved "a waste of public property, or a violation of public rights, or an injury to the interests of taxpayers as such." This reasonable limitation upon the scope of the act does not, however, require that the threatened public injury must necessarily be measurable in dollars and cents. There may well be public interests which a taxpayer is interested to conserve, which

relate to the general public welfare, and which ought to be protected, and which should, in the first instance, be conserved by some original and faithful public officer. In such a case, if the officer, who should protect the public interests, refuses or neglects to do so, the statute authorizes the intervention of a taxpayer. In Peck v. Belknap, supra, the purpose of the action was to compel compliance with the civil service law. In Tompkins v. Pallas, supra, no pecuniary loss to the municipality was threatened, and the sole purpose of the action was to prevent an unlawful use of a public park.

It is a matter of common knowledge that the stringent regulations of the Building Code respecting the construction of theaters were adopted for the protection of the public, and to prevent, if possible, a recurrence of the distressing disasters which have resulted from the destruction of such buildings. In our opinion the public has such a direct interest in the strict observance of the Code upon that subject that a taxpayer may intervene under the statute to prevent a violation of the law, thus doing what the officers of the municipality ought themselves to do. It would be unjust both to the public, and to the owner of the property, to permit the plans to be approved and the building erected— to the public because one of its protective laws would be evaded and set at naught; to the property owner because his building would be an illegal structure and its use might be prevented at any time by some successor to the present superintendent.

The result is that the order appealed from must be reversed, with $10 costs and disbursements, and the motion to continue the temporary injunction pendente lite granted, with $10 costs.

INGRAHAM, P. J., and CLARKE and MILLER, JJ., concur.

LAUGHLIN, J. (dissenting). It is quite clear that this action is not authorized by section 1925 of the Code of Civil Procedure, for it is manifest that the approval of the plans of the building to be erected upon private premises will not in any manner effect a waste of public funds. Neither property nor funds of the municipality are involved in or can be affected by the alleged illegal official act. It is claimed, however, that the action can be maintained under section 51 of the general municipal law (Consol. Laws, c. 24, § 51). That section does not, as I construe it, authorize a taxpayer's action to restrain any threatened illegal official act regardless of whether or not the official act, if consummated, will affect property or funds of the municipal corporation. In terms it authorizes an action to enjoin "any illegal official act"; but this provision is modified by the subsequent provisions of the same sentence which prescribe who may bring the action and for what purpose it may be brought. If it were intended to authorize the action to enjoin any threatened illegal official act, it is not probable that the Legislature would have confined the remedy to taxpayers liable for taxes on property of the assessed value of $1,000, but would have extended the remedy to any resident citizen. The provisions of the section material to the question now under consideration are as follows:

"All officers, agents, commissioners and other persons acting, or who have acted, for and on behalf of any county, town, village or municipal corpora-

tion in this state, and each and every one of them, may be prosecuted, and an action may be maintained against them to prevent any illegal official act on the part of any such officers, agents, commissioners or other persons, or to prevent waste or injury to, or to restore and make good, any property, funds or estate of such county, town, village or municipal corporation by any person or corporation whose assessment, or by any number of persons or corporations jointly, the sum of whose assessments shall amount to one thousand dollars, and who shall be liable to pay taxes on such assessment in the county, town, village or municipal corporation to prevent the waste or injury of whose property the action is brought, or who have been assessed or paid taxes therein upon any assessment of the above-named amount within one year previous to the commencement of any such action."

The majority opinion gives no force or effect to the last part of the sentence, which I think clearly shows that the right of action is given to a taxpayer whose interest as a taxpayer will or may be affected by the alleged illegal official act. By the express terms of the statute, the remedy is given to the taxpayer "to prevent the waste or injury" of the property of the municipality in which as a taxpayer he is interested. I am of opinion that, as under said section 1925 of the Code of Civil Procedure an action may only be maintained for waste of municipal funds, so under said section 51 of the general municipal law, in so far as it relates to illegal official acts, an action may only be maintained to enjoin an illegal official act which will or may result in an unauthorized use or illegal payment of funds of the municipality, or in an injury to or a waste of its property or funds. Questions under section 51 of the general municipal law and the statute of which it is a re-enactment have usually arisen with respect to a threatened illegal application of municipal funds, and the courts have not deemed it necessary to consider the question which is now presented for decision. It is to be borne in mind that originally courts of equity had no jurisdiction over such matters, and authority for the action must be found in the statutory provisions, which, of course, being remedial statutes, are to be construed literally to accomplish the purpose intended by the Legislature. Osterhoudt v. Rigney, 98 N. Y. 222; Queens County Water Co. v. Monroe, 83 App. Div. 105, 82 N. Y. Supp. 610.

If this action can be maintained, then the administration of the municipal law, instead of being left in the first instance to the officials clothed with authority to act, may be taken over by the courts at the instance of any taxpayer. It will only be necessary to allege, in addition to the property qualifications giving a taxpayer a standing, that an application has been made to some municipal body, board, or officer for some illegal permit, act, or action, and that the body, board, or officer threatens to act favorably thereon, and then the threatened action will be enjoined until the court passes upon the legality thereof. A threat to issue a peddler's license, or a license to keep a dog or to carry a revolver, or a license for a parade, or a threat to discharge a subordinate officer or employé without authority, or to do other innumerable things that could in no manner affect property or funds of the corporation, might give rise to a taxpayer's suit if the statute is to be construed literally without giving effect to the provision showing the purpose for which the action is authorized. Public officials would thus be unduly interfered with in the performance of their duties, and

courts would be unduly burdened with litigation. No harm can come to the property or funds of the municipal corporation by the threatened action of the superintendent of buildings with respect to approving the plans in question. If he should approve the plans, and if that would be illegal, then his act would be a nullity, and it would not authorize the erection or alteration of the building in accordance with the plans, and such erection or alteration may be enjoined at the instance of an abutting property owner, or of the owner of property in the neighborhood, whose property rights will or may be affected by the illegal structure. Moreover, doubtless a writ of mandamus would issue to some official whose duty it is to prevent the erection of illegal structures or to prevent and abate nuisances to compel him to perform his duty in case he should fail to perform it. There is, however, I think, on the facts presented, no ground for a taxpayer's action. If funds were to be disbursed or property were to be purchased or disposed of illegally, doubtless it might be presumed on the illegality of the threatened action that the municipal funds or property would be injuriously affected; but the act here threatened, if conceded to be illegal, gives rise to no such presumption.

Therefore in my opinion the court properly denied the application for a temporary injunction, and vacated the injunction issued restraining the defendant from approving the plan pending the determination of the motion for a temporary injunction.

