ALEXANDER ALDRICH et al., Plaintiffs, *v.* CITY OF NEW YORK et al., Defendants.

Supreme Court, Special Term, Queens County, October 25, 1955.

*Newbold Morris* for plaintiffs.

*Peter Campbell Brown, Corporation Counsel (Harry E. O'Donnell* and *Morris R. Weitzer* of counsel), for defendants.

*Thomas I. Brennan* for Downtown Community Assn. Inc., *amicus curiæ.*

DALY, J. In this taxpayers' action, plaintiffs move for an injunction *pendente lite* and defendants cross-move (1) to dismiss the complaint for failure to state facts sufficient to constitute a cause of action, (2) for judgment on the pleadings and (3) for summary judgment.

Plaintiffs are members of the board of directors of the Park Association of New York City, Inc., a nonprofit membership corporation organized for the preservation and extension of city parks and playgrounds. Defendants are the City of New York and the members of its board of estimate.

Formal allegations aside, the complaint contains the following facts: By chapter 456 of the Laws of 1906, the Legislature of the State of New York authorized the City of New York to establish and maintain a seaside park for the health and recreation of its citizens, and empowered the city to acquire a site, either by a private sale or by condemnation proceedings, as

determined by the board of estimate and apportionment, which was authorized to appropriate $2,500,000 for such purpose. Under that statute, the care, management and control of the property was vested directly in the park department, but the board of estimate and apportionment (as it was then known) was empowered to erect, maintain and support a hospital or hospitals so long as the hospital buildings did not disfigure the park or interfere with the purposes of public use and recreation. Chapter 456 of the Laws of 1906, it is alleged, is still in full force and effect.

Pursuant to the authority conferred by that statute, the board of estimate and apportionment, by successive resolutions in the years 1911, 1912 and 1913, acquired by condemnation a tract of land, comprising approximately 262 acres, for park purposes. That tract of land has since become known and still is known as Jacob Riis Park. By resolution dated January 25, 1912, the property was designated upon the map as a public park. Title was vested in the City of New York on March 21, 1912, and the final decree of condemnation was dated April 14, 1913.

By resolution of the board of estimate and apportionment adopted on April 24, 1913, a site of approximately fourteen and four-tenths acres was withdrawn from the jurisdiction of the department of parks and conferred upon the board of trustees of Bellevue & Allied Hospitals for the construction of the Neponsit Beach Hospital, which was thereafter done, but that site has remained on the city map as a part of a public park.

Recently, the Neponsit Beach Hospital was discontinued, and on April 21, 1955, the board of estimate accepted the surrender of the entire site of Neponsit Beach Hospital from the department of hospitals. Thereafter, the commissioner of parks, by communications to the board, proposed to utilize the former hospital land to extend Jacob Riis Park in order to relieve overcrowded conditions at the park and beach areas, to develop lands for softball and baseball fields and to construct a new salt-water swimming pool.

A report of the city planning commission, adopted on June 29, 1955, recommended the assignment of the Neponsit Beach property to the department of parks.

In a report of the acting director of the budget to the board of estimate, dated July 14, 1955, three alternatives for the disposition of the property in question were pointed out: (1) Retain the property under the jurisdiction of the board and offer it for sale to private developers. (2) Assign the beach and sufficient upland for the extension of the promenade to the end of

Rockaway Beach. (3) Assign all the property to the department of parks as requested.

On July 21, 1955, the board of estimate, by a vote of ten to six, defeated a resolution formally authorizing the assignment of the hospital site to the department of parks.

In paragraph 11 of their complaint plaintiffs allege, on information and belief, that " there is a definite proposal before the Board of Estimate from a private developer to purchase said property for the purpose of erecting a ' beach club and hotel thereon '." In paragraph 12 plaintiffs allege, also on information and belief, that: " the Comptroller of the City of New York has recommended and continues to threaten to recommend to the Board of Estimate the sale of said property to private purchasers; that the action of certain other members of the Board of Estimate, namely, the Presidents of the five Borough[s], in voting to disapprove the resolution before the Board of Estimate on July 21, 1955, authorizing the assignment of said property to the Department of Parks implies agreement with the Comptroller and presents an immediate danger that said Board of Estimate, by majority vote, might authorize such sale to private purchasers in accordance with the expressed recommendation of the Comptroller." And in paragraph 16 plaintiffs allege: " That the matter of the disposal of said City-owned property is still before the Board of Estimate; that said Board of Estimate might at any time take action to offer such City-owned property for sale to private purchasers."

In conclusion, plaintiffs allege that any action of the board of estimate to offer the site of the discontinued Neponsit Beach Hospital for sale to private purchasers and the sale of such property to private purchasers would constitute an illegal official act on the part of the board which would imperil public interest and which should be permanently enjoined. Appropriate injunctive relief, both permanent and temporary, is demanded.

The answer consists of specific denials and two affirmative defenses. The only specific denials to which reference need be made are those contained in paragraphs X and XI, respectively, which read as follows: " X. Deny each and every allegation and statement contained in paragraphs or subdivisions of the complaint designated therein ' 12 ', except that they admit that the Comptroller of the City of New York had suggested the advisability of considering the sale of the portion of the property involved, other than the waterfront, so as to restore such portion to the tax rolls. XI. Deny each and every allegation and statement contained in paragraph or subdivision of the complaint

designated therein ' 16 ', except that they admit that the matter of the disposal of said City-owned real property, whether for public use, quasi-public use, or otherwise, has not yet been acted upon by the Board of Estimate and that the Board of Estimate might take such action with reference thereto as is authorized by law, after such legal and proper notice and hearing as is required by law."

For a first affirmative defense, defendants allege that no definitive action has been taken with respect to the subject matter complained of; and, for a second affirmative defense, defendants allege that although no definitive action has as yet been taken, they are vested by law with the power to do all which plaintiffs allege defendants may do with respect to the matter complained of.

Basically, only two issues are presented for determination. They are: (1) Is this action premature? (2) If it is not, does the city have the power, under existing law, to do the acts sought to be enjoined?

Defendants contend most strongly that this action is premature since the board of estimate has made no definitive decision as to what disposition should be made of the Neponsit tract. But such a decision seems not to be required in order to entitle a taxpayer to maintain an action under section 51 of the General Municipal Law. That section provides, in pertinent part, that an action may be maintained by a taxpayer " to *prevent* any illegal official act " on the part of one acting on behalf of a municipal corporation (emphasis supplied). True, mere illegality is not enough; " it must appear that in addition to being an illegal official act the *threatened* act is such as to imperil the public interests or calculated to work public injury or produce some public mischief." (*Altschul* v. *Ludwig,* 216 N. Y. 459, 467 [emphasis supplied]; see, also, *Hurley* v. *Tolfree,* 308 N. Y. 358, 364–365.) Waste, in a strict sense, need not be shown, but only waste " in the sense that they [the acts complained of] represent a use of public property or funds for entirely illegal purposes." (*Kaskel* v. *Impellitteri,* 306 N. Y. 73, 79.) There is no requirement that " the threatened public injury  *  *  * be measurable in dollars and cents." (*Brill* v. *Miller,* 140 App. Div. 602, 607.) When one reflects upon the numerous times that unlawful *uses* of public parks have been enjoined (e.g., see *Williams* v. *Gallatin,* 229 N. Y. 248; *Reid* v. *City of Fulton,* 181 Misc. 711, affd. 269 App. Div. 894; *Williams* v. *Hylan,* 126 Misc. 807, affd. 217 App. Div. 727, and *Tompkins* v. *Pallas,* 47 Misc. 309), there would seem little need for discussion of the propo-

sition that unlawful *sales* of such parks may also be enjoined. That such an illegal act would " imperil the public interests or [be] calculated to work public injury or produce some public mischief " (*Altschul* v. *Ludwig, supra,* p. 467) needs but to be stated to be demonstrated.

And the threat need not be posed by a decision already made. If such were not the case the word " prevent " would be virtually elided from the statute (General Municipal Law, § 51). A decision made without authority *is* an illegal official act. In effect the statute grants a taxpayer the right, in a proper case, to *prevent* the making of that decision. For example, in *Brill* v. *Miller* (*supra*), the Appellate Division, First Department, reversed an order denying an injunction *pendente lite* in an action " to *restrain* the defendant  *  *  * *from approving* plans for the erection of a building " (140 App. Div. 602, 603 [emphasis supplied]). " The statute (General Municipal Law, § 51)," wrote the court, " provides both for prevention and for reparation " (p. 606). The *Brill* case was expressly followed by the same court in *Altschul* v. *Ludwig* (170 App. Div. 957) which was, in turn, unanimously affirmed by the Court of Appeals (216 N. Y. 459, 462), the latter answering in the affirmative the following certified question: " Can an action be maintained by a taxpayer to restrain the superintendent of buildings from approving plans for the erection or remodeling of a theatre in the city of New York, on the ground that the plans do not comply with the Building Law? "

*Tinker* v. *O'Dell* (134 App. Div. 272), relied upon by defendants, is distinguishable. There, a taxpayer sought to enjoin town authorities from expending money to construct or improve a road when the only action which the town had taken was to determine whether it owned the road. " It is clear " wrote the Appellate Division of this department (pp. 274–275), " that the intention of the boards was that such acts other than the employment and work of counsel in ascertaining title were not to be performed until the ownership and rights of the town dependent thereon had been ascertained. In the absence of any evidence of an illegal act done or intended to be done, the action was prematurely commenced and the complaint properly dismissed."

The situation presented here is quite different from that presented in the *Tinker* case. While the newspaper articles annexed to plaintiffs' moving papers are not competent evidence of the matter therein contained (*Whelan* v. *Lynch,* 60 N. Y. 469), it would seem most unrealistic for this court to say, upon the record before it, that plaintiffs' fears are fanciful. The board

of estimate, by a vote of ten to six, has defeated a resolution which would have assigned the Neponsit tract to the department of parks. The resolution (No. 175, dated July 21, 1955) included, among other things, the possible disposition which could be made of the property (p. 103), the first of which was to offer the property for sale to private developers; the second, to assign only the beach and sufficient upland to extend the promenade to the end of Rockaway Beach and the third, to assign all of the property to the department of parks as requested. Defeat of that resolution presents a very real threat that the property may be offered for sale to private purchasers. Of course, the possibility exists that the board of estimate may not do so. But in *Brill* v. *Miller* and *Altschul* v. *Ludwig* (*supra*), the possibility also existed that the building superintendent would not approve the proposed plans. Nevertheless, the courts held that the taxpayers involved had the right to maintain their respective actions and to obtain injunctive relief.

Furthermore, the comptroller, in his affidavit (p. 2), states: '' It is possible, however, that the fears expressed by the plaintiffs in their complaint are correct, and that the City authorities may, in accordance with law, decide that it should be sold and thus restored to the tax rolls for substantial and well needed revenue.'' And again, '' Speaking strictly for myself, it is true indeed that I suggested to my colleagues in the Board of Estimate that perhaps consideration should be given to the thought that this property be sold and thus restored to the tax rolls.''

It follows, therefore, that this action is one which plaintiffs may bring and that it was not prematurely brought.

The question remaining is whether the City of New York has the power, under existing law, to sell or offer to sell the Neponsit tract to private purchasers.

By chapter 456 of the Laws of 1906 the Legislature of the State of New York authorized the City of New York to acquire, either at a private sale or by condemnation proceedings, '' a site * * * in the city of New York or in a county adjacent thereto * * * for the purpose of establishing and maintaining a seaside park for public health and recreation, and to lay out and make avenues, public parks and playgrounds and bathing pavilions on said site '' (§ 1). The only use, other than a park use, permitted by the Legislature, was a hospital use (§ 4).

In 1911, in express pursuance of the provisions of chapter 456 of the Laws of 1906, the board of estimate and apportionment adopted three resolutions, dated July 27th, September 21st and December 14th, respectively. The following excerpts from the

last of those resolutions will adequately describe all three: "Resolved, That the Board of Estimate and Apportionment of The City of New York, *in pursuance of Chapter 456 of the Laws of 1906*, and of the provisions of the Greater New York Charter, as amended, *deems it for the public interest that title should be acquired by The City of New York to* all of the lands and premises included within the public park (*Seaside Park*) at Rockaway Beach, Fifth Ward, in the Borough of Queens, City of New York, as shown on a map bearing the signature of the Secretary of the Board of Estimate and Apportionment, dated July 27, 1911, adopted by the Board of Estimate and Apportionment on September 21, 1911, by a resolution which was approved by the Mayor on September 26, 1911 \* \* \*. Resolved, That the title to be so acquired is hereby determined to be a title in fee, *for the purposes of said chapter 456 of the Laws of 1906.* Resolved, That the Board of Estimate and Apportionment of The City of New York, deeming it for the public interest so to do, hereby requests the Corporation Counsel to make application to a Special Term of the Supreme Court for the appointment of Commissioners of Estimate, and to take the necessary proceedings in the name of The City of New York to acquire title to all the lands, tenements and hereditaments that shall or may be required for the aforesaid Seaside Park, as above determined, for the use of the public, and for the *purposes enumerated in chapter 456 of the Laws of 1906,* wherever the same has not heretofore been acquired, for public use." (Emphasis supplied.)

Thereafter, the property was acquired by the city in condemnation proceedings. True, the statute in question was not expressly mentioned in those proceedings, but the three resolutions adverted to above (plus the full caption of the condemnation proceedings) establish conclusively that title was acquired to the property for the purposes specified in chapter 456 of the Laws of 1906 and for no others. Such being the case, while the city took title to the land it took it for the public use as a park and held it in trust for that special purpose. "Receiving the title in trust for an especial public use, it could not convey without the sanction of the legislature." (*Brooklyn Park Comrs.* v. *Armstrong,* 45 N. Y. 234, 243; see, also, *Matter of Central Parkway,* 140 Misc. 727, 728–729.)

The question here is whether the city has received "the sanction of the legislature" to dispose of park property. Contending that it has, defendants point to the repeal of chapter

456 of the Laws of 1906; section 12 of article IX of the State Constitution (originally § 3, art. XII); section 11 of the City Home Rule Law; and sections 69 and 383 of the New York City Charter.

As noted above the entire 262-acre tract, which eventually came to be and still is known as Jacob Riis Park, was impressed with a trust the moment title to it vested in the City of New York. This trust was impressed upon the *entire* tract. It was *all* park land. The circumstances that *part* of it was withdrawn for hospital *use* did not change the essential character of any part of the property. Since the property was impressed with a trust for the public it could neither be differently used nor alienated without legislative sanction. (*Brooklyn Park Comrs.* v. *Armstrong,* 45 N. Y. 234, 243, *supra; Williams* v. *Gallatin,* 229 N. Y. 248, 253, *supra; American Dock Co.* v. *City of New York,* 174 Misc. 813, 824, affd. 261 App. Div. 1063, affd. 286 N. Y. 658; *Durkin* v. *City of New York,* 146 App. Div. 472, 473; *Matter of Central Parkway,* 140 Misc. 727, 728–729, *supra;* see, also, 10 McQuillin on Municipal Corporations [3d ed.], pp. 77, 82; 64 C. J. S., Municipal Corporations, p. 298, and 38 Am. Jur., Municipal Corporations, pp. 165–166.)

It has been held that legislative authority permitting encroachment upon park purposes must be " plainly conferred." (*Williams* v. *Gallatin,* 229 N. Y. 248, 253, *supra.*) When speaking of the legislative authority to alienate public parks, language varying only slightly has been used. Some have said that the legislative authority must be " special " (*American Dock Co.* v. *City of New York,* 174 Misc. 813, 824, affd. 261 App. Div. 1063, affd. 286 N. Y. 658, *supra; Lake Co. Water & Light Co.* v. *Walsh,* 160 Ind. 32, 39; 10 McQuillin on Municipal Corporations [3d ed.], pp. 77, 82); others, that such authority must be " specific " (*Buckhout* v. *City of Newport,* 68 R. I. 280, 287–288) or " direct " (*Sebring* v. *Quackenbush,* 120 Misc. 609, 613, affd. 214 App. Div. 758) or " express " (*State ex rel. Excelsior Springs* v. *Smith,* 336 Mo. 1104, 1113). Add to the foregoing the well-settled rule that " When there is a fair, reasonable and substantial doubt concerning the existence of an alleged power in a municipality, the power should be denied " (*Matter of City of New York* [*Piers Old Nos. 8–11*], 228 N. Y. 140, 152), and it seems clear that the legislative authority required to enable a municipality to sell its public parks must be plain.

Chapter 456 of the Laws of 1906 was repealed by chapter 929 of the Laws of 1937, effective January 1, 1938. Plaintiffs con-

tend that said statute was not in fact repealed, but that its repeal was the result of inadvertence or error, basing their contention upon section 982–1.0 of the Administrative Code of the City of New York. In the opinion of this court the conclusion to be reached will be unaffected by whether the statute in question was effectively repealed. Assuming that it was, mere repeal certainly falls far short of absolving the city from its trust and conferring upon it authority to sell the property in question. Indeed, section 93 of the General Construction Law provides that " The repeal of a statute  *   *   *  shall not affect or impair any  *   *   *  right accruing, accrued or acquired  *   *   *  prior to the time such repeal takes effect ". The rights of the public in the land acquired pursuant to the authority conferred by chapter 456 of the Laws of 1906 were vested long prior to its repeal.

The home rule amendment to the State Constitution (originally art. XII, § 3, now art. IX, § 12) and re-enactment of that provision in section 11 of the City Home Rule Law did not confer upon cities the power to alienate public park land. " Ordinarily land held for park purposes is held for the benefit of the people of the state at large and not only for the benefit of the local inhabitants ". (64 C. J. S., Municipal Corporations, p. 299; and see *Adler* v. *Deegan,* 251 N. Y. 467, 477–478.) Why this should be so is apparent. Parks play a vital role in the health of a community, which " has more to do with the general prosperity and welfare of a State than its wealth or its learning or its culture." (*Adler* v. *Deegan, supra,* p. 478.) As stated by a noted authority, " In densely populated cities, public parks are manifestly essential to the health, comfort and pleasure of their citizens ". (10 McQuillin on Municipal Corporations [3d ed.], p. 123.) It follows, therefore, that a public park is a matter of more than purely local concern.

The decision in *Tobin* v. *Hennessy* (130 Misc. 226, 227, affd. on another ground 223 App. Div. 10) is not to the contrary. There, Special Term merely held that a local law of the City of New York, authorizing the commissioner of parks of the Borough of The Bronx to collect rentals for the temporary use and occupation of that part of Pelham Bay Park known as Orchard Beach until that beach could be " actually laid out, regulated, beautified and utilized for the purposes of the park " was valid. Although the Appellate Division expressly refused to pass upon the validity of the local law, it appeared that subdivision 1 of section 151 of the Greater New York Charter expressly authorized the temporary rental of property " acquired by the city for public

purposes between the time of the acquisition thereof and the time when the same can be actually utilized for the purpose for which it was acquired ''.

There remains for consideration the effect to be given to sections 69 and 383 of the Charter of the City of New York, upon which defendants heavily rely.

Section 69 provides that '' The board (of estimate) shall have power with the approval of the mayor to assign to use for any public purposes any city property, for whatsoever purpose originally acquired, which it may find to be no longer required for such purpose and may assign space in any city building to any agency.'' That section obviously is of no aid to defendants. It expressly restricts the use of city property to a '' public '' purpose and it is not the assignment of the Neponsit tract to any public use which is here sought to be enjoined. It may also be noted that an almost identical provision was contained in the Greater New York Charter (§ 205).

Section 383 provides that '' The rights of the city in and to its water front, ferries, wharf property, bridges, land under water, public landings, wharves, docks, streets, avenues, highways, parks and all other public places are hereby declared to be inalienable; but upon the closing or discontinuance of any street, avenue, park or other public place, the property may be sold or otherwise disposed of as may be provided by law, and leases of land under water, wharf property, wharves, docks and piers may be made as may be provided by law. Nothing herein contained shall prevent the granting of franchises, permits and licenses in respect to inalienable property.'' There is in that provision no express grant of power to *discontinue or close* a park. (Cf. General City Law, § 20, subd. 7, as to property other than parks; and see *Matter of Central Parkway*, 140 Misc. 727, *supra,* construing that statute.) Section 383 simply provides that '' upon the closing or discontinuance '' of any park the property may be sold. The *power,* however, to discontinue or close must elsewhere be conferred if park property is to be sold. Such power has been conferred, for example, as to streets. (Administrative Code of City of New York, § E 15–3.0; *Matter of City of New York* [*Gillen Place*], 304 N. Y. 215; *City of New York* v. *Aviation Distributors,* 84 N. Y. S. 2d 84; see, also, General City Law, § 20, subd. 7.) Had the Legislature intended to confer power to discontinue or close parks, as well as power to sell, it could have expressed such intention as it did in subdivision 7 of section 20 of the General City Law where it provided, in the part pertaining to streets, that every city is

empowered " *To* lay out, establish, construct, maintain, operate, alter and *discontinue* streets * * * *and upon the discontinuance thereof to sell and convey the same* ". (Emphasis supplied.) As previously noted, statutory authority either to encroach upon park purposes or to alienate park lands must be plain. (*Williams* v. *Gallatin,* 229 N. Y. 248, 253, *supra; American Dock Co.* v. *City of New York,* 174 Misc. 813, 824, affd. 261 App. Div. 1063, affd. 286 N. Y. 658, *supra; Sebring* v. *Quackenbush,* 120 Misc. 609, 613, affd. 214 App. Div. 759, *supra; Lake Co. Water & Light Co.* v. *Walsh,* 160 Ind. 32, 39; *State ex rel. Excelsior Springs* v. *Smith,* 336 Mo. 1104, 1113; *Buckhout* v. *City of Newport,* 68 R. I. 280, 287; 10 McQuillin on Municipal Corporations [3d ed.], pp. 77, 82.) The authority conferred by section 383 of the New York City Charter is anything but plain. It is, at best, extremely doubtful that power to discontinue or close a park (indispensable to the sale of park property) has been conferred. Such being the case, " the power should be denied." (*Matter of City of New York* [*Piers Old Nos. 8–11*], 228 N. Y. 140, 152, *supra.*)

It is the conclusion of this court that the city may not do other with the Neponsit tract than devote it to park or hospital use, except as otherwise expressly provided in section 69 of the charter.

Accordingly, plaintiffs' motion is granted and defendants' motion is in all respects denied.

Settle order.