AMERICAN DOCK COMPANY and Others, Plaintiffs, *v.* THE CITY OF NEW YORK and Others, Defendants.

Supreme Court, Special Term, New York County, August 2, 1940.

*Miller, Owen, Otis & Bailly* [*Carl M. Owen, Redmond F. Kernan, Jr., Charles A. Davey* and *James E. Carroll* of counsel], for the plaintiffs.

*Burlingham, Veeder, Clark & Hupper* [*John L. Galey* and *Stanley R. Wright* of counsel], for the defendant New York Foreign Trade Zone Operators, Incorporated.

*William C. Chanler, Corporation Counsel* [*Seymour B. Quel, Oscar L. Tucker, George G. Gallantz* and *Arthur H. Kahn* of counsel], for the defendants other than the New York Foreign Trade Zone Operators, Incorporated.

*John T. Cahill, United States Attorney for the Southern District of New York* [*William F. Young* of counsel], as *amicus curiæ*, for the Foreign Trade Zones Board.

EDER, J. This is a taxpayers' action brought under section 51 of the General Municipal Law. The defendants are the city, the members of the board of estimate, the commissioner of docks, the commissioner of purchase and New York Foreign Trade Zone Operators, Incorporated (hereafter styled Zone Operators), a domestic private corporation.

The plaintiffs by this action seek a judgment declaring invalid a contract entered into on May 11, 1938, between the city and Zone Operators whereby the latter undertook and assumed to operate a foreign trade zone theretofore operated by the city at Stapleton, on Staten Island, in the borough of Richmond, under a Federal grant (U. S. Code, tit. 19, § 81-g) obtained from the Foreign Trade Zones Board (hereafter styled Zones Board and Board). By the contract the city agreed to maintain the physical condition of the fixed property and fixed equipment in the zone. On November 30, 1938, the city made application to the Works Progress Administration for a WPA project at the zone to improve facilities and grounds. The total estimated cost of this project was $1,638,500 of which the city proposed to contribute $389,500. On March 2, 1939, the board of estimate adopted a resolution authorizing the issuance of corporate stock or serial bonds to cover the city's contribution.

The rules and regulations governing the operation of the zone, promulgated by the commissioner of docks, and the proposed construction in the zone were filed with the Zones Board. The grant to the city was awarded on January 30, 1936; the operation of the zone was commenced by it on February 1, 1937, and continued until May 10, 1938. Zone Operators has continued to operate the zone under the contract ever since May 11, 1938. From the very outset the operation of the zone by the city was conducted at a loss; its continued operation was found to be inexpedient and it was ultimately decided that private operation of the zone would be the more practical and expedient solution;

the private operation of the zone has resulted in benefit to the city.

Although the plaintiffs were fully aware of the situation, they did not commence this action until May 15, 1939, more than a year after the signing of the contract between the city and Zone Operators. Five causes of action are alleged. Summarized, the claims are that the city lacked the power to enter into the operating contract with Zone Operators; that it constituted a transfer of the grant and a violation of the grant as the statute explicitly declares that " The grant shall not be sold, conveyed, transferred, set over, or assigned " (U. S. Code, tit. 19, § 81-q); that as the operating contract between the city and Zone Operators is invalid the authorization by the board of estimate for the issuance of corporate stock or serial bonds to procure the $389,500 to be paid by the city as its share of the WPA improvement at the zone is, in consequence, illegal; that even if the operating contract is valid public funds may not be expended for the benefit of the zone because it is subject to private operation. There is also the claim of various technical defects alleged to exist in the advertisement for the contract and in the contract itself, such as the failure to sufficiently describe terminal facilities and the provision that the city shall maintain the fixed property in the zone.

It may be here remarked, for the moment, that the Zones Board expressed the view that the operating contract is not a violation of the statute (U. S. Code, tit. 19, chap. 1-a).

As the defendants challenge the right of this court to entertain the action, this question will be first considered, since, if the point is well taken, it necessarily forecloses a consideration of the merits.

It is contended that this action is, in effect, a suit against the United States; that the interests of the United States are involved, or necessarily so; that the judgment rendered herein, if favorable to the plaintiffs, would materially affect the interests of the United States and that as the Zones Board has " ruled " the operating contract between the city and Zone Operators to be valid, the judgment of this court, if plaintiffs succeed, would result in a ruling of a Federal board being upset by a collateral attack in a State court; that the United States or any agency created by it can be sued only with the consent of the United States and that no such consent has been obtained (*Saranac Land & Timber Co.* v. *Roberts*, 195 N. Y. 303, 320); also, that quite apart from this, there is a fatal defect of parties herein in that the Federal grant to the city to operate and maintain the zone is a contract between them, though of a unique character, and that the plaintiffs cannot upset

the grant in an action in which both parties to the grant are not joined as defendants. Various cases are cited to support these claims but it is unnecessary to discuss them as this court is of the opinion that they are without application here.

Neither the United States nor the Zones Board is a necessary or proper party to this action. The Federal grant to the city to operate and maintain the zone is in no way involved in this suit and any judgment rendered, if favorable to plaintiffs, will in no manner impair or affect the grant or any right or interest of the United States in any form. All that this action involves, basically, is the validity of the operating contract between the city and Zone Operators, as a private corporation, and the respective rights, interests and obligations under it as between them only. Should the operating contract be held to be invalid it will simply result in a declaration by this court that the obligation of the city to operate the zone is non-transferrable under the grant, or that the contract is invalid for other reasons, as between the city and Zone Operators, in which event the city itself would have to continue the operation of the zone.

No right or interest of the United States, as far as I am able to perceive, is or can possibly be affected by such a declaration. And if this court should decree to be illegal the resolution of the board of estimate authorizing the proposed issuance of corporate stock or serial bonds for the benefit of the zone because it is subject to private operation, even if the operating contract is valid, I am likewise unable to perceive how any right or interest of the United States is involved or affected, or can be, by such a determination. The grant between the United States and the city is in no way even remotely involved or affected. The operating contract between the city and Zone Operators is one between them solely as independent contracting principals.

The adoption by the Zones Board of the view of its subcommittee of law officers that the operating contract between the city and Zone Operators does not violate section 81-q, *supra,* is not and does not constitute an " order " of a Federal agency, board or commission. There was no " adoption " by the Zones Board of the operating contract between the city and Zone Operators; it was not a party thereto; the status and rights of the United States under the grant were in no way affected by the mentioned expression of its view; no " order " was ever made or issued by it with respect thereto; what is styled a " ruling " is but a mere expression of opinion, gratuitously given upon a request by the city for a construction of section 81-q, *supra;* this request was a superfluous act; the corporation counsel was the proper law

officer from whom the city should have sought a legal opinion. If, in addition, it chose also to supplement or fortify his opinion (I assume it was obtained) with that of the view of the Zones Board in that respect, as helpful, there was nothing amiss in doing so, though it may be observed that this advisory opinion was sought on February 28, 1939, some nine months after the operating contract was entered into between the city and Zone Operators (on May 11, 1938).

Assume that the Zones Board had expressed the view that the operating contract violated the terms of section 81-q, it would have had no effect whatever; its view of approval of the operating contract was wholly unnecessary and was not required; its view of approval or disapproval thereof would not and could not, in the slightest degree, affect the grant or any interest or obligation of the United States and the city as parties to it; these would still remain wholly unaffected and unimpaired; nor would its view constitute an " order " or " ruling " of the Board as a governmental agency. Those terms are well understood. (*American Federation of Labor* v. *National Labor Relations Board*, 308 U. S. 401; *United Employees Assn.* v. *National Labor Relations Board*, 96 F. [2d] 875, 876.) A breach or violation by either party to the operating contract between the city and Zone Operators, any lawsuit resulting therefrom, would in no way concern or involve any interest whatever of the United States, either under the operating contract or under the grant. There is no force to these contentions; they are destitute of merit; the suit is in no sense one against the United States or involving any right or interest thereof (*Burck* v. *Taylor*, 152 U. S. 634, 648; *Dulaney* v. *Scudder*, 94 Fed. 6; *Twin Falls Canal Co.* v. *American Falls Reservoir Dist. No. 2*, 45 F. [2d] 649; *Enterprise Irr. Dist.* v. *Enterprise Land & Invest. Co.*, 137 Ore. 468; 300 P. 507; *Philadelphia Co.* v. *Dickinson*, 33 App. D. C. 338; affd., 223 U. S. 605), and the claims are overruled.

I now proceed to a consideration of the merits.

The power of the city to operate and maintain the zone was conferred by chapter 246 of the Laws of 1935, in effect March 26, 1935. The Federal grant to the city was awarded on January 30, 1936; the operating contract between the city and Zone Operators was entered into on May 11, 1938. On January 1, 1938, the new city charter went into effect. By chapter 929 of the Laws of 1937, in effect December 30, 1937, the Administrative Code of the city of New York was enacted in harmony with and supplemental to the New York city charter. (See Preamble.) The table of repealed laws annexed to the Administrative Code included said chapter 246 of the Laws of 1935. (Adm. Code, p. 1731.)

There arises, in consequence, the question whether the city could, after January 1, 1938, continue to operate the zone either directly or under the operating contract. If the effect of this repeal is inflexible and all inclusive, it follows as a necessary corollary and legal sequence that no such power under this particular enactment any longer existed and the action of the board of estimate authorizing the operating contract was, in consequence, null and void, unless there is some other statute authorizing the continuance of the operation and maintenance of the zone.

It is a general rule in the construction and interpretation of statutes that the intent of the Legislature is the primary object sought (*Wiley* v. *Solvay Process Co.*, 215 N. Y. 584, 588; *Matter of Sherrill* v. *O'Brien*, 188 id. 185, 207), and generally courts do not favor a departure from literal construction unless the context or surrounding circumstances indicate that the literal wording does not express the actual intent of the lawmakers. (*People* v. *Sharp*, 107 N. Y. 427, 454; *Tompkins* v. *Hunter*, 149 id. 117, 122.) Exceptions in a proper case are recognized to avoid an unreasonable or absurd result. As is so forcefully stated in *Morgan* v. *Hedstrom* (164 N. Y. 224, 230): " When the courts make an exception from the letter of a statute, because the subject excepted is not within its spirit and meaning, they do so to avoid a result so unreasonable or absurd as to force the conviction upon the mind that the excepted subject could not have been intended by the Legislature, and that if it had been presented to that body, it would have disclaimed any intention to include it."

The test in Bacon's Abridgement, of similar import (vol. IX, p. 248), has met judicial approval. (*People ex rel. Manhattan R. Co.* v. *Barker*, 152 N. Y. 417, 447; *New York Central & H. R. R. R. Co.* v. *General Electric Co.*, 167 App. Div. 726, 735; revd. on other grounds, 219 N. Y. 227.) As an illustration of this principle, and as a leading example in this State, see *Riggs* v. *Palmer* (115 N. Y. 506). (See, also, 2 Sutherland on Statutory Construction [2d ed.], §§ 489, 490; Black on Interpretation of Laws [2d ed.], § 46.)

The purpose of the Administrative Code, the saving clauses therein, and pertinent provisions in the new city charter clearly indicate that it was not the intent of the Legislature to prohibit the city's continued operation and maintenance of the zone. The purpose of the Administrative Code is plainly expressed in section 1-0.0 and reads as follows: " Code; a restatement and codification. The purpose of this code is solely to codify and restate present existing statutes and laws, general, special and local, except in instances where changes are necessary to conform such statutes to the New York city charter." Section 963-1.0 (p. 1175) thereof

reads as follows: " Existing rights and remedies saved. No existing right or remedy of any kind shall be lost or impaired by reason of any provision of the code." Finally, section 704c–3.0 (p. 959) contains a specific reference to the continued operation of the zone, in subdivision c, as follows: " Nothing contained in subdivision a of this section shall be construed as interfering in any respect with the government or regulation *of the Staten Island free port.*" (Italics supplied.)

This express exception clearly indicates to my mind that the Legislature contemplated and intended the continued operation of the zone, else the provision is meaningless; a contrary construction would lead to absurd and other objectionable consequences. I believe I hazard nothing in saying that the Legislature never intended such an absurdity. If the Legislature had intended legislation resulting in such consequences it is to be safely assumed and, indeed, it may be taken for granted, it would have said so in unequivocal terms and in explicit language. (*Esterbrook* v. *Savage,* 21 Hun, 145, 152.) Moreover, it is a fundamental rule in the interpretation of statutes that a construction which will cause or produce objectionable results is to be avoided. The Legislature is presumed to have intended that good and not bad will result from its enactments. (*People ex rel. Beaman* v. *Feitner,* 168 N. Y. 360, 366.) An absurd purpose is not to be imputed to the Legislature and a construction which will produce an absurdity is to be discarded. (*People* v. *Lovell,* 21 Misc. 570; *Head's Iron Foundry* v. *Sanders,* 77 Hun, 432, 435; *Schnaier* v. *Navarre Hotel & Imp. Co.,* 182 N. Y. 83, 87; *Ewen* v. *Thompson-Starrett Co.,* 208 id. 245; 2 Sutherland on Statutory Construction [2d ed.], §§ 489, 490; Black on Interpretation of Laws [2d ed.], § 46.) These views are in accord with the established system of legal interpretation.

Judicial notice is taken of the circumstances under which the Administrative Code was enacted at a special session of the Legislature in December, 1937, on an emergency message and a message of necessity from the Governor at the behest of the city authorities. As said in *Matter of Tobin* v. *LaGuardia* (259 App. Div. 191): " The time was short and the proposed Administrative Code was of considerable length." It was a matter of great haste, and inconsistency, inadvertency or error was very likely to occur. Therefore, it is proper to say that the repeal of chapter 246 of the Laws of 1935, contained in the schedule of laws repealed, annexed to the Administrative Code (p. 1534) " was written in through ' inadvertence or error ' and, consequently, did not have the effect of repealing." (*Matter of Tobin* v. *LaGuardia, supra;* Laws of 1935, chap. 246.) I, therefore, hold that it was not the legislative

intent to repeal chapter 246 of the Laws of 1935, and I am further of the opinion that its inclusion in the schedule of laws repealed, annexed to the Administrative Code, resulted from inadvertence or error.

Aside from the provisions of the Administrative Code, I am of the opinion that the provisions of section 1 of the new city charter clearly confer upon the city the power to continue to operate and maintain the zone. Section 1 provides: " The city of New York as now existing shall continue with the boundaries and with the powers, rights and property and subject to the obligations and liabilities which exist at the time when this charter shall take effect."

Section 93 of the General Construction Law, entitled "Effect of repealing statute upon existing rights," declares that " The repeal of a statute or part thereof shall not affect or impair any * * * right accruing, accrued or acquired * * * prior to the time such repeal takes effect, but the same may be enjoyed, asserted * * * as fully and to the same extent as if such repeal had not been effected." See, also, chapter 29, sections 701 to 712, inclusive, of the charter, conferring upon the commissioner of docks jurisdiction with respect to wharf property, particularly section 708, subdivision a.

Under the above provisions the right of the city to operate and maintain the zone continued after January 1, 1938, since it previously existed; and as the Administrative Code is but a codifying and supplementary statute, nothing in it can abrogate the powers conferred upon the city by the charter. (*Matter of Tobin* v. *LaGuardia, supra.*)

The next question to be considered is the validity of the operating contract between the city and zone operators. In this connection a claim is asserted by the plaintiffs that this has resulted in the transfer of the Federal grant awarded to the city and that Zone Operators has now become the grantee of the grant in violation of section 81-q, *supra.* I see no force in the contention, for the clear purpose of this provision was to prohibit the alienation by the grantee of the grant to establish and maintain a zone. (See House Report No. 1521, 73d Congress, 2d Session, accompanying H. R. 9322, p. 6.) Prohibitory provisions against transfer or assignment are, it is held, enacted solely for the protection of the government, the primary purpose thereof being that it might not be harassed by multiplying the number of persons with whom it had to deal (*Hobbs* v. *McLean*, 117 U. S. 567, 576; *Goodman* v. *Niblack*, 102 id. 556, 560; *Dulaney* v. *Scudder, supra*) and that they are intended for the government alone. In *Burck* v. *Taylor (supra, p. 648)*

the court said: "Its invalidity is only so far as the government is concerned, and it alone can raise any question of the violation of the statute." Yet I am of the opinion that as between the city and Zone Operators the plaintiffs may properly, in a taxpayer's action, urge that an assignment or transfer of the grant is a violation of the statute, since the city might, in consequence, incur obligations and liabilities, ultimately compensable from city funds.

In order to determine the question as to whether the contract between the city and Zone Operators violates this provision it is necessary to consider the provisions of the contract as a whole, and an examination thereof is conducive to the conclusion that there has been no alienation of the grant, for nowhere has the city divested itself of the ownership of the grant; it exercises a substantial supervision and control over the operation of the zone and it fully recognizes its continuing responsibility to the Zones Board for the operation of the zone in accordance with the terms of the grant. While it is true that by the operating contract the city conferred upon Zone Operators a lease or license of a precise character, I am unable to discern anything resulting from this action that constitutes a transfer of the grant.

*United States* v. *City of San Francisco* (310 U. S. 16), relied on strongly by plaintiffs, is distinguishable. By the Raker Act of December 19, 1913 (38 U. S. Stat. at Large, 242, chap. 4), Congress granted the city and county of San Francisco (a municipal corporation), subject to express conditions, certain lands and rights of way in the public domain in Yosemite and Stanislaus National Parks. The grant was known as the "Hetch-Hetchy" grant. The act in terms declared that this grant was intended for use by the city both in constructing and maintaining a means of supplying water for the domestic purposes of the city and other public bodies, and in establishing a system "for generation and sale and distribution of electric energy." The congressional debates indicated clearly that the grant was to be so conditioned as to require municipal performance of the function of supplying Hetch-Hetchy water and electric power directly to ultimate consumers and to prohibit sale or distribution of that power and water to any private corporation or individual. The very purpose of prohibiting any sale or distribution of that power to any private corporation or individual and to require its sale and distribution exclusively by the city directly to consumers was the belief that consumers would thus be afforded power at cheap rates in competition with private power companies, particularly Pacific Gas & Electric Company.

This mentioned prohibition was contained in section 6 of that act. The admitted facts showed that in violation of that section

(and the obvious intent of Congress) the city permitted the sale and distribution of Hetch-Hetchy power by Pacific Gas & Electric Company under a contract with the city which the said company continued to engage in. The city, deliberately and in violation of this inhibitory provision, transferred the right to sell and distribute the power to a private company. Upon application of the Secretary of the Interior, the United States brought suit in equity charging the city with disposing of power through Pacific Gas & Electric Company, a private utility, in violation of said provisions of the granting act. The trial court very properly issued an alternative injunction, either to discontinue such disposal of the power or cease further use of the lands and rights granted it under the act for generation and transmission of electric energy. The factual situation in that case and in the case at bar is not the same. Here the wharves, lands, appurtenances and equipment belong to and are the property of the city. Moreover, the language and extent of the prohibition contained in the grant in the instant case are not at all like that contained in the Hetch-Hetchy grant. There is no comparable analogy. This claim is, accordingly, overruled.

As to the operating contract, the general claim is made by the city that its power to operate the zone carries with it a correlative right to do through the medium of a third party that which it may do directly. The basis of this claim is that the contract between it and Zone Operators is merely one for the rendition of services such as the city could itself render in operating the zone, and that it may engage the services of a substitute to do so. But while so describing the nature of the contract the mere characterization thereof is not at all conclusive, but its true nature is to be determined from the whole contract in its true light and not from its characterization merely. ( *United States* v. *City of San Francisco, supra.* ) So read in its entirety it denotes what is in effect a lease — a demise of definitely described real property, to wit, the entire zone consisting of Piers 12, 13, 14, 15 and 16, at Stapleton, Staten Island, together with the upland, lands under water and water areas adjacent thereto, as more particularly described on the map designated as " Exhibit No. 10 — Foreign Trade Zone No. 1, Staten Island, New York City," with all its facilities and appurtenances — the fixed property and fixed equipment — to a private party, for a definite term of twenty years, upon payment of a stipulated sum and Zone Operators thus given public property held for public use to a possession and use exclusively private so far as Zone Operators are concerned. The fact that it is subject to supervision and control by the commissioner of docks does not change the character of the contract.

The word " operate " is merely descriptive of the nature of the use to which the demised premises shall be put, being equivalent to " to be used for " or " to be used as." The revenue derived does not belong to the city exclusively; both Zone Operators and the city share in it; the former may, in turn, allow to others, for a charge, the facilities and appurtenances of the zone. These and many other provisions therein are illustrative of a lease of real property and its accompaniments as distinguished from a contract for the rendition merely of a service, and they cannot be glossed over merely by employment of the word " services." (*United States* v. *City of San Francisco, supra.*)

The question whether a municipality may, by lease or license, permit property acquired or held by it for the public use to be wholly or partly diverted to a possession or use exclusively private without specific legislative authority is not new. " A municipality may hold property either in its corporate capacity as an ordinary proprietor or solely for the public use. Whether it can devote any part of its property even temporarily to a private use depends entirely upon the capacity in which it holds title." (*People ex rel. Swan* v. *Doxsee*, 136 App. Div. 400, 403; affd., 198 N. Y. 605.) The general rule as laid down in *Meriwether* v. *Garrett* (102 U. S. 472, 513) is as follows: " In its streets, wharves, cemeteries, hospitals, court houses, and other public buildings, the corporation has no proprietary rights distinct from the trust for the public. It holds them for public use, and to no other use can they be appropriated without special legislative sanction. It would be a perversion of that trust to apply them to other uses."

Thus in the *Swan* case (*supra*) the Legislature had passed an act authorizing the town of Islip to purchase docks at Islip and Bay Shore in said town for public use. Proceeding under the terms of the act it bought a dock at Islip. The act provided that the trustees of the town lands should have the charge and supervision of the dock, bulkheads and landing places, and the power to prescribe rules and regulations for the use thereof by the public. After the town took title the trustees of the town lands entered into a lease with a private corporation granting to it the exclusive use of portions of the dock for a term of years at an annual rental. Upon challenge in a taxpayer's action that in the absence of special legislative sanction the trustees of the town lands had no authority to enter into a lease of the dock to a private corporation to be used for business purposes, the court held the challenge to be good and sustained it. Reference is made in the opinion that by early statutes the public authorities of the city of New York were given power to lease, not the wharves themselves, but simply the right

to collect wharfage and that it was not until 1875 that legislative authority was given to the city authorities to permit private structures thereon. The court said (p. 404): " So firmly was the doctrine of exclusive public use for public wharves imbedded in the law that even the power of the Legislature to grant such authority was seriously challenged as in derogation of the public right." (Citing *People* v. *B. & O. R. R. Co.,* 117 N. Y. 150.)

I am, therefore, unable to concur in the view of the defendants that the power of the city to directly operate the zone carries with it as incidental a concomitant right to operate it through the medium of a contract such as the one involved in the instant case, resulting as it does in a lease by the municipality — for that is in substance and effect what the operating contract is — of public property held by it for public use and its diversion to a possession or use exclusively private, for private business purposes, in the absence of special legislative fiat.

The defendants contend that such legislative sanction is to be found in section 19 and section 20, subdivisions 1, 8 and 23, of article 2-A of the General City Law, in sections 1 and 708, subdivision a, of the city charter, and also in section 704c–3.0 (p. 959) of the Administrative Code. I do not believe any of these provisions constitute or can be construed as constituting a special legislative sanction authorizing a lease or diversion of public property held by the city for public use to a possession or use exclusively private, for private business purposes. In the analysis presently made this element will be found lacking in the cited provisions.

Section 19 of the General City Law deals with a general grant of powers and not with a specific grant. Section 20, while it deals with a grant of specific powers, does not, in subdivisions 1, 8 and 23 thereof, authorize a lease or diversion of such public property to a possession or use exclusively private. Subdivision 1 merely empowers a city to contract and be contracted with, meaning, of course, for any authorized purpose. Subdivision 8 merely authorizes a city " to control and administer the water front and waterways of the city and to establish, maintain, operate and regulate docks, piers, wharves, warehouses and all adjuncts and facilities for navigation and commerce and for the utilization of the water front and waterways and adjacent property." It authorizes these acts to be done by the city but does not authorize it to lease or divert public property held by it for public use, to a possession or use exclusively private, for private business purposes. Subdivision 23 empowers a city " To exercise all powers necessary and proper for carrying into execution the powers granted to the city."

Its effect is merely to invest a city with incidental powers, though not expressed, necessary to carry into effect the specific powers granted, and nothing more. It is not a special legislative sanction authorizing the lease or diversion of public property held for the public use to a possession or use exclusively private, for private business purposes.

Section 1 of the charter reads as follows: " The city of New York as now existing shall continue with the boundaries and with the powers, rights and property and subject to the obligations and liabilities which exist at the time when this charter shall take effect." This provision is in no sense a special legislative sanction to the city to lease or divert such public property, so held by it, to a possession exclusively private, for private business purposes.

Section 708, subdivision a, of the charter provides that " The commissioner may by order set aside any wharf property belonging to the city, which has not been leased, for general wharfage purposes or for the use of any special kind of commerce, or of any class of vessel, or of any agency, and may revoke or modify such order as to any such wharf property at any time." This provision plainly refers to the operation by the city itself of its wharf property as a means of revenue in the form of wharfage collections, and I am unable to envision it as a special legislative sanction to the city to lease or divert public property held by it for public use to a possession or use exclusively private, for private business purposes.

Section 704c–3.0, subdivision c, of the Administrative Code (p. 959) merely confirms the power *of the city* to continue operation of the zone after January 1, 1938, and nothing in it indicates, to my mind, a specific or even general legislative sanction to the city to lease or divert public property held by it for public use to a possession or use exclusively private, for private business purposes. Essentially this section deals with the construction of sheds on wharf property, but, nonetheless, subdivision c thereof clearly continues the power of the city to continue the operation of the zone. It reads as follows: " c. Nothing contained in subdivision a of this section shall be construed as interfering in any respect with the government or regulation of the Staten Island free port."

Defendants cite various cases as supporting the claim that a municipal corporation possesses not only the powers specifically conferred upon it by its charter, but also such as are necessarily incident to or may fairly be implied from those powers, including all that are essential to the declared object of its existence. This necessarily presupposes the existence of such a power; but such a power does not exist in any of the statutes mentioned. In support of the claim just discussed the defendants cite *Gushee* v. *City of*

*New York* (42 App. Div. 37), which is the strongest of the cases cited, and it is an authority in support of such a claim, but it has no application here, for the case is clearly distinguishable. There it was held that the city might lease a structure in its parks to private parties to be used for refreshment purposes open to the public generally, and the ground of decision was that said use was incidental to the general purpose of public recreation and, therefore, in aid of the fullest public use. Indeed, the *Gushee* case was for this reason held inapplicable in the *Swan* case (*supra*) and similarly distinguished in *McNamara* v. *Willcox* (73 App. Div. 451).

But section B29–5.0 and section B29–9.0 of the Administrative Code seem to me to clearly authorize, aside from chapter 246 of the Laws of 1935, the continued operation and maintenance of the zone and to authorize its private operation, under certain express conditions. Chapter 29 of the Administrative Code relates to the department of docks. Title B thereof relates to and deals with "Water Front Terminals." Section B29–5.0 (p. 969), so far as here material, provides that "The board of estimate may direct the commissioner to operate or permit the use of terminal facilities upon such terms and subject to such regulations as such board from time to time may establish * * *." Section B29–9.0 (p. 969) is entitled "Private Operation," and provides for private operation of terminal facilities: " a. If the board of estimate shall determine that municipal operation of any terminal facilities is inexpedient, it shall advertise for proposals for the privilege of * * * " (1) constructing, equipping and operating the same, or (2) for equipping and operating after construction by the city, or (3) for operating after construction and equipment by the city. It further provides that "All proposals shall undertake to equip such facilities, unless equipment shall have been provided by the city, and to maintain and operate such terminal facilities for a period not exceeding twenty-five years * * *."

It is plaintiffs' claim that the operating contract violates this provision as it is for operation only and imposes no obligation of equipment on the operator as the Code requires and that, on the contrary, the city is obligated to furnish all equipment; that in violation of this provision of the Code the contract expressly places upon the city the expense of maintaining such facilities instead of placing the cost upon the operator, and that in violation of this statute the operating contract obligates the city to pay the operating expenses instead of the operator. As a concomitant claim it is urged that the operating contract is also invalid in that the city has no authority to make a contract with Zone Operators for the operation of the freight terminal facilities because it is a corporation

organized under the Stock Corporation Law; that as such a corporation it is without corporate power under the laws of this State to operate a public utility; that a corporation whose purpose is to operate freight terminal facilities, whether privately owned or publicly owned, must be organized under the Transportation Corporations Law, which, under article 8 thereof, expressly relates to and deals with " Freight Terminal Corporations." Here an irreconcilable inconsistency appears. Section 5 of article 2 of the Stock Corporation Law provides that " Three or more persons may become a stock corporation for any lawful business purpose * * * except to do in this State any business for which a corporation may be formed under or pursuant to the banking law, the insurance law, the railroad law, or the transportation corporations law * * *." This would seem plain enough. Yet section 109 of the Transportation Corporations Law, entitled " Inconsistent acts," expressly declares that " Nothing in this article shall be construed to prevent the organization of a corporation under the provisions of article two of the stock corporation law for the purpose of owning, controlling or operating warehouses, docks, wharves, or water craft, but no corporation formed for any such purpose under the provisions of the stock corporation law shall have the right or power to acquire real property by condemnation."

In view of the fact that article 8 of the Transportation Corporations Law expressly deals with " Freight Terminal Corporations " and section 109 thereof deals with " Inconsistent acts " and specifically excepts a corporation organized under article 2 of the Stock Corporation Law from the operation of said article 8, and in view, also, of the rule of statutory construction that an exemption excludes from the operation of an enactment that which would otherwise fall within its scope (*Rowell* v. *Janvrin,* 151 N. Y. 60, 67), I must hold that Zone Operators, a corporation organized under article 2 of the Stock Corporation Law, may lawfully engage in the operation of freight terminal facilities, and that the attack on the legality of the operating contract on that ground is untenable.

However, there is force to the plaintiffs' contention that the operating contract is invalid because it violates section B29-9.0 of the Administrative Code in that it imposes no obligation of equipment on the operator — as the Code requires — and the city is obligated to furnish all equipment, in violation thereof. The contract also places upon the city the expense of maintaining the terminal facilities instead of placing this expense upon the operator. The operating contract also obligates the city to pay the operating expenses, in violation of this provision, for it is pro-

vided in paragraph " 7 " thereof that " The City agrees at its own expense  *  *  *  a. To maintain the physical condition of the fixed property and fixed equipment in the zone; b. To make all repairs necessary to put Piers Nos. 12 and 13 in usable condition, one by September 1, 1938, and one by October 1, 1938, as required by U. S. Board; c. To pay the cost of maintaining the customs service for the Zone to the extent required to be paid by the operator of the Zone under Section 14 of the Celler Act and provide and pay the cost of operating such additional safeguards for the customs service as the operator of the Zone may be lawfully required by the appropriate Federal authorities to provide and pay the cost of operating."

These contentions seem to me to be sound, and I, therefore, sustain them. In doing so I am not unmindful of the defendants' contention that the plaintiffs have failed to show any waste or injury in connection with the operating contract. I am unable to concur in this view. If the private operator is required to bear the burden of equipment, maintenance and operation, it is to this extent a saving of municipal funds; if, on the other hand, in violation of the mentioned provision these burdens are assumed by the city, instead of by the private operator, as the statute requires, it necessarily depletes the city treasury in that amount, and to that extent constitutes waste and injury; it results in an increased burden upon and disadvantage to the municipality and to the interests represented by it and so to those who are taxpayers.

There is a further claim made by plaintiffs and that is that the operating contract is invalid in that it violates the provisions of section 1 of article VIII of the State Constitution, which provides, in part: " No  *  *  *  city  *  *  *  shall give or loan any money or property to or in aid of any  *  *  *  private corporation  *  *  *  nor shall any  *  *  *  city  *  *  *  give or loan its credit to or in aid of any  *  *  *  private corporation."

In order to finance the cost of the construction of the contemplated new facilities, the city, by resolution of the board of estimate of March 2, 1939, proposed to sell corporate stock or serial bonds in the amount of $389,500. I find that the contract does not require the issuance of bonds or stock or the expenditures contemplated under the proposed arrangement between the city and the Works Progress Administration. Therefore, it must follow that even the illegality of the operating contract cannot constitute a reason for enjoining the carrying out of the proposal, since the contemplated expenditure is in connection with the improvement of city property. This claim is, therefore, overruled.

Lastly, on the question of laches. It has not been shown that any harm or injury has been occasioned to any one by reason of any delay in the commencement of this action, and the claim of laches is, accordingly, held untenable.

In conclusion, it may be said that the court would have much preferred ability to uphold the validity of the operating contract since it appears to have proved more beneficial to the city; but law is law, and a judge cannot balance between his personal inclinations and what he conceives to be his plain duty.

It has been stipulated that the provisions of sections 439 and 440, Civil Practice Act, with respect to findings of fact, be waived and that the court may render such decision as may be warranted by the facts without regard to said provisions. Judgment as follows: For plaintiffs on the second cause of action; for defendants on the first, third, fourth and fifth causes of action. The city and Zone Operators will be enjoined from further carrying out the operating contract of May 11, 1938. Submit judgment on two days' notice of presentation.