DENIHAN ENTERPRISES, INC., Plaintiff, *v.* WILLIAM O'DWYER et al., Constituting the Board of Estimate of the City of New York, et al., Defendants.

Supreme Court, Special Term, New York County, April 26, 1950.

*John P. McGrath, Corporation Counsel* (*Harry E. O'Donnell* of counsel), for defendants.

*Raymond J. McGrover* for plaintiff.

HAMMER, J. This is a taxpayer's action instituted pursuant to section 51 of the General Municipal Law.

Injunctive relief is sought restraining the city from performance of the provisions of a contract made with the New York Life Insurance Company dated February 16, 1950. In this agreement the insurance company, which is not a party to this action, is referred to as Nylic. For convenience, it will be at times similarly referred to herein.

The agreement in question provides that the city will acquire certain real property for street opening purposes and " to effectuate the purposes of Chapter 453 of the Laws of 1949 " (General Municipal Law, § 72-j). The latter statute permits the acquisition of lands by a municipality for the purpose of

erecting parking garages or areas to be operated by said municipalities or for sale or lease to private individuals or corporations for such purposes.

Under the agreement Nylic undertakes to bid on certain expressed terms, for a fifty-year lease if the condemned realty is offered at public auction by the city. The provisions of the lease are also agreed upon.

The real property in question is located in the easterly portion of the block bounded by East 64th and East 65th Streets and by 3rd and 2nd Avenues in the city and county of New York. Nylic has acquired the entire block immediately to the north and is erecting thereon a large apartment house.

The pertinent parts of the agreement and lease are these:

The lessee will erect a garage capable of storing 750 to 1,000 cars and may provide for stores and other commercial facilities on the 2nd Avenue front to a depth not in excess of 130 feet running west from 2nd Avenue.

The cost of condemnation and taxes on the condemned property from the date of condemnation to the closing date of the lease is payable as initial rent in two installments, one before the lease closing and the other, on demand, after the closing. In addition an annual rent of approximately $25,000 is to be paid.

All residential tenants are to be relocated at the lessee's expense.

There is a provision in respect of the zoning or rezoning of the area for garage purposes.

The entire roof of the structure, which will not be more than two stories high, will be landscaped as provided. The southern portion, or " approximately 50% " is to be improved as a public " sitting " park and is to be maintained by the city through its park department. The northerly portion of the landscaped area is to be maintained by the proposed lessee, Nylic. The use to which this latter portion will be put does not appear to be stated.

The lessee is obligated to repave East 65th Street between 2nd and 3rd Avenues and to install a mall.

The lessee does not have the privilege of assigning, mortgaging or pledging the lease.

The allocation of space between car owners who seek weekly or monthly storage as distinguished from transients is left to the lessee who shall, in determining this allocation, give consideration to the recommendation of the traffic commission contained in its report of May 23, 1949, which states " This garage

will fill a need for storage space for the automobiles owned by the residents of the area and will afford a limited amount of space for transient parking during the day.''

A provision is stated for fixing the rate to be charged those using the garage.

Plaintiff, a taxpayer, and an owner of some of the real property to be condemned seeks the injunctive relief urging (1) that chapter 453 of the Laws of 1949 is unconstitutional; (2) that the property to be taken is not being taken for a public use; (3) that defendants have exceeded their authority in making the agreement.

The city moves to dismiss the complaint for legal insufficiency contending (a) that the acquisition of the land in question is in the public interest and (b) that it is not a valid objection that the project to be erected on the land acquired may result in an incidental private benefit if a public purpose is served.

Many of the legal questions which arise in considering the issues pointed upon these motions were discussed at length in the *Matter of Bronx Chamber of Commerce* v. *Fuller* (174 Misc. 524, HAMMER, J.). There, the right of the city in the exercise of the power of eminent domain to acquire for demolition the elevated structures in 2nd and 9th Avenues was challenged.

The recurring features of eminent domain referred to herein were fully considered there. Here we are concerned with a statute and a use which is therein '' declared to be a public purpose ''. The statute in the *Bronx Chamber of Commerce* case (*supra*) did not contain such language but the implication of public use was drawn therefrom. At that time and prior thereto acquisition of land for garage purposes might not have been regarded as a public use. Whether or not it must be so regarded under the statute here requires further particularization.

The primary issue is the constitutionality of section 72-j of the General Municipal Law (L. 1949, ch. 453). The test to be applied in determining the constitutionality of this law is whether or not acquisitions of land under said statute are taken for public purposes.

In adopting the enabling legislation previously referred to the Legislature provided: '' It is hereby declared that there exists within municipalities in the state an acute shortage of parking and garage facilities as a result of which there is a serious condition of traffic congestion which constitutes a threat to the health, welfare and safety of the people of such municipali-

ties; that such traffic congestion can be substantially relieved by providing adequate parking and garage facilities; that adequate parking and garage facilities and the relief of such traffic congestion will be facilitated by the provisions of this act and that the desirability in the public interest for the provisions hereinafter provided in this act is hereby declared as a matter of legislative determination. It is further declared that adequate provision of public parking and garage facilities is necessary, and desirable to promote and aid in the clearance, replanning, reconstruction and rehabilitation of substandard and insanitary areas in such municipalities. The providing of public parking and garage facilities in the manner hereinafter set forth is hereby declared to be a public purpose." (L. 1949, ch. 453, § 1.)

The pertinent parts of the statute itself (§ 72-j), i.e., subdivisions 3 and 4 thereof, are, as a matter of clarity in our consideration, set forth at length:

" 3. Any municipal corporation, acting through its board of estimate or other governing body, may, in addition to exercising the powers granted to it by subdivision two hereof, sell, lease for a term not exceeding ninety-nine years, or otherwise dispose of any real property or any interest therein owned by it or acquired by it pursuant to this section, to any person, firm or corporation at the highest marketable price or rental at public auction or by sealed bids pursuant to the provisions of any general, special or local law applicable to the sale, lease, or disposition of real property by such municipal corporation, for the purpose of the construction or establishment on such real property of public parking garages or public parking spaces for the relief of traffic congestion and for the maintenance and operation thereof. Any deed, lease, or instrument by which real property or any interest therein is conveyed or disposed of shall contain provisions requiring the purchaser, grantee, or lessee to construct or establish on such real property one or more public parking garages or public parking spaces and to maintain and operate the same for such period as may be prescribed by the board of estimate or other governing body, provisions fixing or providing for the approval by the board of estimate or other analogous body of rates to be charged for the use of such facilities by the operators thereof, and may also contain provisions authorizing the use of such portion of the property for other commercial purposes as may be necessary to provide revenue adequate to permit the operation of the

principal portion of the property for public parking garages and public parking space. Such deed or instrument may contain such other provisions, conditions and restrictions, including specifications relating to construction, and the rentals at which such property may be leased or subleased by the grantee or lessee as the board of estimate or other governing body may prescribe. The prior consent of the city planning commission or other analogous body of such municipal corporation shall be required for the acquisition by such municipal corporation of property for the purposes of this subdivision, which prior consent shall be based upon a finding by such city planning commission or other analogous body of the desirability thereof and after public hearings thereon.

" 4. As used in this section, a public garage shall mean any building or facility where motor vehicles are parked, stored, serviced or repaired, and whose space and facilities are available to the public, with or without fee or charge, without regard to the residence, business or employment of the motor vehicle owner or operator seeking such space or facilities."

The Legislature has therefore held that an emergency exists in large cities with reference to parking and garage spaces. The legislative pronouncement conclusively establishes the necessity. While in respect of the question of public use such determinations are not binding on the courts (*Pocantico Water Works Co.* v. *Bird,* 130 N. Y. 249), they are entitled " to great respect, since they relate to public conditions concerning which the Legislature both by necessity and duty must have known." (*Matter of New York City Housing Authority* v. *Muller,* 270 N. Y. 333, 339 and cases there cited.)

Passing to the question of whether or not the acquisition of land for parking and garaging of cars is a public use, consideration must, therefore, be given to the expression of legislative intent expressed in adopting section 72-j of the General Municipal Law and, on the same reasoning although to a lesser degree, to the enactments of the local Legislature and the reports of municipal commissions, offices and of public groups interested in the parking problem in this great city. These are before the court by stipulation. Even in the absence of such data, however, it is perfectly clear to anyone who traverses our streets whether he be pedestrian or operator of an automobile, regardless of its type, that there is a shortage of parking and garage space. This has come about for many reasons. The more obvious only will be indicated. City streets were not laid out in the contemplation that they would be

intensively used by fast-moving, easily maneuverable automotive vehicles which, in many instances are quite as large as railroad freight cars; zoning regulations, desirable as they are for orderly urban development, tend to keep parking areas and garages at considerable distance from desirable residential and business sections and the relocation of residential areas on the tremendous scale which has resulted from public and private housing projects such as Lillian Wald Houses, Parkchester and Stuyvesant Town, etc. has brought about parking and garaging problems beyond the existing capacity of these facilities in the areas in which these housing improvements have been located. The result has been the cluttering with parked cars of practically every available street in the business and residential areas of the city. Nor does the condition much improve at night, as previously it did when garage space was obtainable, although it may shift somewhat at home-going time, when residential areas are overburdened. In such a situation does the taking of privately owned land for public parking and garage areas with the resulting alleviation of the traffic problems constitute a taking for a public use? The answer lies in the definition of a public use. CROUCH, J., in *Matter of New York City Housing Authority* v. *Muller* (*supra,* p. 340) has said, " Over many years and in a multitude of cases the courts have vainly attempted to define comprehensively the concept of a public use and to formulate a universal test. They have found here as elsewhere that to formulate anything ultimate, even though it were possible, would, in an inevitably changing world, be unwise if not futile." Previously CARDOZO, then Chief Judge of our Court of Appeals, in a similar vein observed: " A city acts for city purposes when it builds a dock or a bridge or a street or a subway * * *. Its purpose is not different when it builds an airport * * *." (*Hesse* v. *Rath,* 249 N. Y. 436, 438.) The taking of private land for public housing has been approved as a public use (*Matter of New York City Housing Authority* v. *Muller, supra*) and such takings approved when the new housing was erected by private corporations (*Matter of Murray* v. *LaGuardia,* 291 N. Y. 320). In this State the levy of a local improvement assessment in connection with land condemned for a public parking space has received judicial approval (*Ambassador Management Corp.* v. *Village of Hempstead,* 186 Misc. 74, affd. 270 App. Div. 898, appeal dismissed 296 N. Y. 666, certiorari denied 330 U. S. 835). In Pennsylvania an act creating a Public Parking Authority, with a right of eminent domain, was held to be constitutional

(*McSorley* v. *Fitzgerald,* 359 Pa. 264). Similar results have been reached in other States (*Wayne Village President* [*Parr*] v. *Wayne Village Clerk* [*Ladd*], 323 Mich. 592; *Cleveland* v. *City of Detroit,* 324 Mich. 527; *Miller* v. *City of Georgetown,* 301 Ky. 241). Public highways, bridges, railroad rights of way, improvements of such rights of way, railway and other terminal facilities, elevated railroads, telegraph and telephone lines, water supply, drainage and irrigation projects, canals, piers, sewers, sewage disposal plants, levees, public markets, public buildings, slum clearance and apartment house developments and public cemeteries, have all, at various times and in various jurisdictions, been held public uses.

There is no means of transportation which serves the public more extensively than does the motor vehicle. The necessity for garaging is unquestionable. Obtaining garages through private enterprise in the present or approximately near future obviously may not be reasonably expected. The demand for parking and storage being so great, failure of garage building by private capital may be attributed only to the unprofitableness and consequent impracticability of such adventure. Public necessity requires that the multiplicity of parked cars be removed from the city streets where they are a menacing condition bringing about traffic congestion and a threat to the health, welfare and safety of the public. This can only be done by supplying parking and storage garages. Private enterprise is unwilling and unattracted and in any event has failed to supply the demand. It follows that there is only one available remedy to alleviate the condition which has caused the public necessity. That is for the public to undertake the obligation of supplying the necessary garages. This brings the fulfillment of such an obligation within the concept of a public use. What is to be done when completed, will enhance the public good.

The increasing " need for vision of the future in the governance of cities " (*Hesse* v. *Rath, supra* p. 438) appears to require the holding that private land may be acquired for public storage and parking garages. That such a holding could not have been reasonably adjudicated in even the quite recent past is probably true, but that was also equally true when land was first taken by eminent domain for many of the public purposes previously adverted to, but such is the wisdom and benefit that has come to pass from unwillingness or inability of the courts to finally define a public use.

It having been determined that the statute in consideration has in contemplation acquisition of land for public use, it follows that there can be no doubt of constitutionality.

The next question is the propriety of the taking considered in the light of the agreement between the city and Nylic to which there has been previous reference. Preliminarily it is noted that the statute permits the sale and leasing of the acquired land to private individuals or corporations for garage and parking purposes. The land to be acquired for the purpose provided for in the statute is to be acquired by the city in its trust and not its proprietary capacity. It may not, therefore, be used for any other use without specific legislative provision (*American Dock Co.* v. *City of New York*, 174 Misc. 813, 824, affd. 261 App. Div. 1063, affd. 286 N. Y. 658; *People ex rel. Swan* v. *Doxsee*, 136 App. Div. 400, affd. 198 N. Y. 605; *Meriwether* v. *Garrett*, 102 U. S. 472). Such legislative provision is present in the statute under consideration and was similarly present in the legislative enactments under consideration in *Matter of Murray* v. *LaGuardia* (*supra*, pp. 329–330), where it was held " Nor do we find merit in the related argument that unconstitutionality results from the fact that in the present case the statute permits the City to exercise the power of eminent domain to accomplish a project, from which Metropolitan — a private corporation — may ultimately reap a profit. If, upon completion of the project the public good is enhanced it does not matter that private interests may be benefited (*Board of Hudson River Regulating District* v. *Fonda J. & G. R. R. Co.*, 249 N. Y. 445, 453.)" The authority of defendants to make an agreement such as that before the court is therefore absolute.

Some question has been raised as to the degree of alleviation which will result from the improvement. So long as it appears that the existing condition will be alleviated, it must be held that a public purpose is being served.

Nor does the fact that the specifications contained in the agreement will limit prospective bidders to corporations or individuals with large resources present grounds for enjoining the performance of the contract. From the very nature of the improvement it is desirable from the city's point of view that the lessee have ample means not only to erect but to maintain such an improvement.

With reference to the park on the roof of the structure it is noted that the southern half is to be a public " sitting " park

maintained by the city and that the northern half is to be maintained by Nylic. No provision is made for the use of this portion of the property by Nylic exclusively and it must be assumed that none is in contemplation since a taking for such use would not be one for the public benefit. It may well be that any possible objection in this respect is to be remedied by further agreement.

The objections with reference to the commercial space provisions are of no avail. Such use is distinctly provided for in the statute for the purpose of establishing reasonable rates for the garage use. The right to fix these rates within the limitation of what appears to be a fair return to the lessee is retained by the city. In computing these rates the return from the commercial space must be considered as part of the fair return to the lessee.

Lastly, reference is made to subdivision 4 of section 72-j of the General Municipal Law. The term there defined is " public garage ". The term elsewhere used in the section is " public parking garage ". The definition however is sufficiently broad to include not only the term " public garage " but also " public parking garage." It must therefore be held that both storage and parking garages were in the contemplation of the Legislature and the agreement quite clearly has in contemplation both uses, quite naturally, from a business point of view, giving broad latitude to the lessee with reference to the allocation of each use.

The conclusion is that the statute is constitutional, that the use for which the land is being acquired is public, and that the agreement is in no way at variance with the statute.

It follows that the complaint must be dismissed and the injunctive relief requested, denied. The motions are so determined.